**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

‗‗‗‗‗‗‗‗‗‗‗

No. 07-9002

‗‗‗‗‗‗‗‗‗‗‗

TERRANCE WILLIAMS,

Appellant

v.

JEFFREY BEARD, Commissioner, Pennsylvania Department
of Corrections; LOUIS B. FOLINO, Superintendent of the
State Correctional Institution at Greene; FRANK TENNIS,
Acting Superintendent of the State Correctional Institution at
Rockview; THE DISTRICT ATTORNEY OF THE
COUNTY OF PHILADELPHIA; THE ATTORNEY
GENERAL OF THE STATE OF PENNSYLVANIA

‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗

On appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 05-cv-03486
District Judge: The Honorable Michael M. Baylson

‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗

Argued December 7, 2010

Before: SMITH, CHAGARES, and ALDISERT, *Circuit Judges*

(Filed: March 9, 2011)

Helen Marino
Michael Wiseman (argued)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA  19106
         *Counsel for Appellant*

John W. Goldsborough (argued)
Office of the District Attorney
Three South Penn Square
Philadelphia, PA  19107
         *Counsel for Appellees*

————————————

OPINION

————————————

SMITH, *Circuit Judge.*

Twenty-five years ago, petitioner Terrance Williams was tried and convicted of first degree murder for the killing of Amos Norwood.  A jury then returned a sentence of death.

2

After two decades of appeals in the Pennsylvania state courts, Williams filed a petition for federal habeas review pursuant to 28 U.S.C. § 2254. The District Court denied the petition but certified two questions for our review, to wit: (1) whether trial counsel was constitutionally ineffective during the penalty phase of trial, and (2) whether the Commonwealth exercised its peremptory strikes in a racially discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). We permitted Williams to expand the certificate of appealability to include a question regarding the constitutional propriety of the trial court's accomplice liability instructions. We conclude that each issue is without merit and will affirm.

# I

The story of Terrance Williams is reminiscent of Dr. Jekyll and Mr. Hyde. As Dr. Jekyll, Williams was a local football star, the quarterback of the Germantown High School team that won the Philadelphia Public League championship in 1982. He was presented with the sportsman of the year award by the Philadelphia Board of Sports Officials, and he was recruited by at least eight different collegiate institutions. Nearly all of Williams' coaches and teachers described him as mild-mannered, law-abiding, and honest. In 1983, Williams graduated from Germantown High and matriculated to Cheney State College in Philadelphia. In the estimation of one of his instructors, Williams was "highly respected and admired by his teacher[s] and all of his classmates." He was "[n]ot only . . . the star of the school's football team, but [was] also . . . a classmate and student who showed respect for others and accepted his popularity with modesty."

3

But apparently Terrance Williams had a sinister side. In the dead of night on Christmas Eve in 1982, a sixteen-year-old Williams broke into the Philadelphia residence of Don and Hilda Dorfman, aged sixty-nine and sixty-four, respectively.  He entered Mrs. Dorfman's bedroom, wakened her by pressing a .22 caliber Winchester rifle to her neck, and then pulled a bedsheet over her face.  When Mrs. Dorfman attempted to remove the sheet, Williams ordered her to stop "or her fucking head would be blown off."  Williams then fired the rifle three times into the wall to show the victims he was serious.  Williams and an accomplice ransacked the home before making off with cash, jewelry, and the Dorfmans' automobile.

It was not long before Williams was apprehended and criminally charged for robbing and terrorizing the Dorfmans. Although his age placed him under the jurisdiction of the juvenile court, the Commonwealth moved to certify Williams as an adult.  In an attempt to avoid certification, Williams produced no fewer than eight witnesses who attested to his stable home life, loving parents, and supportive extended family.   Every  character  witness  interviewed  by  the Commonwealth believed Williams to be innocent.  Even his own attorney would testify years later, "I didn't feel in my own mind of mind[s] and heart of hearts that [Williams] was involved in the matter."  Such was the nature of Williams' dual existence.

In spite of the efforts to avoid it, Williams was certified to stand trial as an adult.  He was released pending trial, however, and in January of 1984, he embarked in

4

earnest on a crime spree that would continue for the better part of six months. Williams' next victim was a fifty-one-year-old man named Herbert Hamilton, an individual from whom Williams had been receiving money in exchange for sex. This relationship, like much else in Williams' life, was kept hidden from most who knew him. Hamilton apparently threatened to publicize the secret, so Williams took action.

On January 26, 1984, Williams called on Hamilton at his home. The two eventually retired to the bedroom and, as they proceeded toward the bed, Williams withdrew a concealed ten-inch butcher knife and attempted to stab Hamilton. Hamilton fought back, wrestled the knife from Williams, and stabbed Williams in the chest. Hamilton then dropped the knife and ran into the kitchen to telephone for assistance. Meanwhile, Williams retrieved a nearby baseball bat, chased after Hamilton, and beat him with the bat until Hamilton was bloody and severely wounded. Williams then recovered the butcher knife and stabbed Hamilton approximately twenty times—twice in the head, ten times in the back, once in the neck, four times in the chest, and once each in the abdomen, arm, and thumb. Finally, Williams drove the butcher knife through the back of Hamilton's neck until it protruded through the other side. He then doused Hamilton's body with kerosene and unsuccessfully attempted to set fire to it. When police officers later entered the apartment, they found Hamilton's kerosene-soaked body with the knife jammed through his neck; on the bathroom mirror, the phrase "I loved you" was scrawled in toothpaste. Williams was then seventeen.

The Hamilton murder remained unsolved at the time that Williams went to trial for the Dorfman robbery in February of 1984. Williams maintained his innocence of the robbery throughout trial. He and his counsel mustered at least nine character witnesses who testified that Williams was a peaceful, law-abiding, and honest young man. The jury was not persuaded. They returned a conviction for two counts of robbery as felonies of the first degree, one count of burglary, one count of simple assault, one count of unauthorized use of an automobile, and one count of conspiracy. Williams was nevertheless released pending sentencing. Tragically, his crime spree continued.

On June 11, 1984, Williams and a friend, Marc Draper, were gambling with several others on a street corner in the West Mount Airy neighborhood of Philadelphia. It was not long before both young men lost all of their money. While brainstorming potential means by which to recoup their losses, Williams said that he knew a man who lived nearby from whom they could extort cash.[1] According to Williams,

---

[1] Approximately one month before this date, Williams and Draper were arrested for the armed robbery of fifty-three-year-old Robert Hill, an acquaintance of the late Herbert Hamilton. The Commonwealth discontinued the prosecution for this offense after Williams was sentenced to death for the Norwood killing. Evidence of the crime was not presented to the Norwood jury during the trial's penalty phase and was not offered by the Commonwealth during the PCRA proceeding. Given these circumstances, we have not considered the facts relating to this offense for purposes of our present inquiry.

this individual—fifty-six-year-old Amos Norwood—was a closeted homosexual. With a plan that they would threaten to reveal Norwood's secret to his wife, Draper and Williams set off for Norwood's apartment.

When they arrived at Norwood's residence, Williams told Draper to wait outside. Williams emerged with $10 in cash approximately twenty minutes later. Williams and Draper were apparently satisfied with this amount because they returned to the street corner to resume gambling. A short time later, Norwood drove by the corner in his blue Chrysler LeBaron. When he spotted the vehicle, Williams said, "There goes my uncle," flagged down the car, and entered via the passenger side door. Norwood then drove away.

The blue LeBaron returned to the intersection several minutes later, whereupon Williams exited the vehicle, approached Draper, and said quietly, "Play it off like you going home, like you want a ride home, and we gonna take some money." Draper understood Williams to be proposing a robbery. The two then got inside Norwood's automobile and Draper began to provide false directions to his "home." In reality, Draper's directions led Norwood to a secluded area adjacent to the Ivy Hill Cemetery. Once there, Draper reached over the backseat, grabbed Norwood from behind and ordered him "to be quiet and get out of the car." Norwood stopped the vehicle and complied.

Williams and Draper then led Norwood into the cemetery and ordered him to lie facedown near a tombstone.

A quick search of Norwood's person revealed $20 hidden in his sock.  At this point, Norwood began to plead for his life.  The two assailants responded by removing Norwood's clothing and tying him up; Norwood's hands were bound behind his back with his shirt, his legs were bound together with his pants, and his socks were forcefully jammed into his mouth.  Once Norwood was bound, Williams said to Draper, "Wait, I'm going to the car.  We're getting ready to do something."  And he walked off.

Williams returned with a tire iron and a socket wrench, the latter of which he gave to Draper.  Draper, seemingly having second thoughts, urged Williams to leave.  Williams replied, "I know what I'm doin, I know what I'm doin.  Don't worry about it, I know what I'm doin."  He then began battering Norwood's head with the tire iron.  When he noticed that Draper was frozen in place, Williams said, "Man, you with me[?]  We got to do this together."  Draper then sprung into action himself, striking Norwood repeatedly with the socket wrench.  This violent scene continued until Norwood lay motionless and dead.  Draper later recalled that there was blood everywhere.  On the day of his second murder, Williams was four months past his eighteenth birthday.

Williams and Draper soon parted ways.  Draper reported to work, while Williams took Norwood's automobile downtown to meet a friend, Ronald Rucker.  Rucker noticed that Williams was "hyper" and asked him if everything was okay.  Williams then disclosed that he had just "offed a guy" named Amos.  Although Rucker initially did not believe his friend, he began to reconsider after observing blood stains on

Williams' shoes.  Later that night, Williams told Rucker he was "going to get some gas from a gas station to go back to the scene of the crime."  Rucker surmised that Williams intended to burn Norwood's body.  That is precisely what Williams did.

Williams and Draper were eventually undone by their use of a credit card and telephone calling card—both in Norwood's name—that they had taken from Norwood's automobile.  Philadelphia police traced use of the calling card back to Rucker; upon questioning, he implicated Williams and Draper.  When his interview with law enforcement concluded, Rucker informed Williams that he had provided police with Williams' last name.  Panicked, Williams boarded a bus bound for San Francisco.  In the meantime, Draper was arrested and promptly confessed.  He also told police about the Herbert Hamilton killing.  With this information, officers proceeded to obtain a warrant for Williams' arrest.

Approximately halfway through his cross-country bus ride, Williams telephoned his girlfriend, Marlene Rogers.  Rogers informed him about the outstanding arrest warrant, and urged her boyfriend to return to Philadelphia so that he could defend the charges against him.  Her entreaty was apparently convincing, for Williams promptly boarded an airplane and returned east.  On July 23, 1984, he arranged to be arrested in the Philadelphia office of his attorney, Ronald White.  Williams' mother notified a reporter from the *Daily News* that her son would surrender to authorities in White's office.  Before his arrest, Williams told the newspaper, "I wanted to come back and clear my name."  The reporter

9

snapped photographs as Williams was led out of White's office in handcuffs.

Two days later, Williams was sentenced to twelve-and-a-half to twenty years' imprisonment for his participation in the Dorfman robbery. In February 1985, he was tried and convicted of third degree murder for the Hamilton killing. Finally, a jury trial for the Norwood murder commenced in January of 1986 in the Philadelphia Court of Common Pleas. Draper testified for the Commonwealth and detailed the manner in which he and Williams guided Norwood to the Ivy Hill Cemetery, robbed and bound him, and then beat him to death. Williams later took the stand in his own defense and pinned the murder on Draper and another individual, Michael Hopkins. The jury rejected Williams' testimony and returned a conviction for first degree murder, robbery, and conspiracy.

The trial's penalty phase began immediately after the jury announced its verdict.[2] The Commonwealth introduced evidence that Williams was recently convicted of armed robbery and third degree murder. Williams, in turn, presented three witnesses in mitigation. His mother, Patricia Kemp, described her son's athletic success and testified that he was well-liked and respected by those who knew him. She also

---

[2] At the time of Williams' trial and conviction, Pennsylvania law required that "[a]fter a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment." 42 Pa. Cons. Stat. § 9711(a)(1).

10

characterized Williams' stepfather as a verbally abusive alcoholic who routinely berated her son and once pushed him down a flight of stairs. Ms. Kemp denied participating in any abuse herself. Marlene Rogers, Williams' girlfriend and the mother of his thirteen-month-old child, said that Williams was a "very supportive father" and had never been violent towards her or anyone she knew. The defendant's last mitigation witness added little, rambling that "we all have sinned and come short of the glory of God . . . . We all have committed murder. We all have stolen some things that we should not have done. We all have committed adultery. I don't believe you should kill another person. Blood will be on your hands."

After witness testimony was complete, Williams' trial counsel, Nicholas Panarella, closed by emphasizing the defendant's youth at the time of the murder and by urging the jury to find that age was a mitigating factor in the offense. He then asked that they consider any residual doubt remaining from the guilt phase and argued that a sentence of life imprisonment was sufficiently severe, for it would subject Williams to "all of the brutalities that are associated with prison life." Panarella concluded by pleading for mercy. His plea was rejected. The jury found two aggravating circumstances, namely (1) that the murder occurred during commission of a felony (robbery), 42 Pa. Cons. Stat. § 9711(d)(6), and (2) that Williams had a significant history of felony convictions involving the use or threat of violence, 42 Pa. Cons. Stat. § 9711(d)(9). The jury found that there were no mitigating circumstances present in the case. They returned a sentence of death.

11

# II

Williams has been contesting the jury's death sentence almost from the moment it was announced on February 4, 1986. Shortly after trial, he dismissed Panarella and obtained new counsel, Norris Gelman. Gelman promptly filed a motion for a new trial on ineffective assistance of counsel grounds. On April 24 and July 1, 1987, the trial court held hearings on the motion during which Panarella was called to the stand to provide testimony on his mitigation strategy. He indicated that his central focus was Williams' youth, which he believed to be the mitigating factor most applicable under § 9711 of the Pennsylvania Consolidated Statutes. Panarella also explained that Williams provided him little, if any, assistance, which frustrated efforts to present a strong cadre of character witnesses on the defendant's behalf. Finally, when asked why he did not proffer evidence that Williams was psychologically damaged, Panarella was frank:

> My own personal observations of Mr. Williams were and are that he is a very cold, calculating person. I did not discern any area where there was any doubt in my mind or that would have caused me to consider the fact that he was either not qualified or incapable of standing trial or facing punishment.

At the conclusion of the hearing on July 1, 1987, Williams' motion for a new trial was denied. The trial court thereafter sentenced him to death on the first degree murder conviction.

12

On February 8, 1990, the Pennsylvania Supreme Court affirmed the trial court's judgment and conviction. *See Commonwealth v. Williams* (*Williams I*), 570 A.2d 75 (Pa. 1990). Williams did not petition for *certiorari* in the United States Supreme Court. He did, however, timely file a *pro se* petition for relief under Pennsylvania's Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. § 9541 *et seq.*[3] New counsel was appointed and filed an amended petition raising twenty-three separate claims for relief.[4] Among them, Williams argued that the Commonwealth exercised its peremptory strikes in a racially discriminatory manner, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that Panarella provided constitutionally ineffective assistance during the trial's penalty phase. The Court of Common Pleas denied relief on October 20, 1998, and on December 22, 2004, the Pennsylvania Supreme Court affirmed over the dissent of two justices.[5] *See Commonwealth v. Williams*

---

[3] Williams' PCRA petition was timely because he filed it before the post-conviction statute was amended to require petitioners to seek collateral relief within one year of the date that judgment becomes final. *See* 42 Pa. Cons. Stat. § 9545(b); *see also Lewis v. Horn*, 581 F.3d 92, 97 n.2 (3d Cir. 2009).

[4] For a comprehensive compilation, see the May 8, 2007 order filed by the District Court. *Williams v. Beard*, 2007 U.S. Dist. LEXIS 41310, at *7–10 (E.D. Pa. May 8, 2007).

[5] Williams filed a second PCRA petition on February 18, 2005. The Common Pleas Court dismissed the petition as untimely under 42 Pa. Cons. Stat. § 9545, and the Pennsylvania Supreme Court affirmed on September 27, 2006.

13

(*Williams II*), 863 A.2d 505 (Pa. 2004).

In July of 2005, Williams filed a timely petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania. He therein raised a total of twenty-one claims, most of them not pertinent to the instant appeal. The District Court denied the petition in a thorough memorandum dated May 8, 2007, but granted Williams a certificate of appealability on two issues: (1) whether the Commonwealth exercised its peremptory strikes in a racially discriminatory manner, and (2) whether trial counsel was constitutionally ineffective during the penalty phase. We later granted Williams' motion to expand the certificate of appealability, permitting him to contest the constitutionality of the trial court's jury instructions on accomplice liability.[6] We address each of these issues in turn.

## III

The District Court had jurisdiction under 28 U.S.C. §§

---

[6] We also granted Williams' motion to certify a fourth issue for review, namely: whether the aggravating circumstance set forth at 42 Pa. Cons. Stat. § 9711(d)(6) was improperly applied by the jury in violation of due process and the Eighth Amendment. Williams later abandoned this issue, stating, "Since the jury found another valid aggravating circumstance and no mitigating factors, Petitioner does not believe he can show prejudice resulting from this error and will not pursue this claim." Appellant Br. at 1 n.1. Accordingly, we do not address this contention.

2241 and 2254.  We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.  The District Court did not conduct an evidentiary hearing in this case, instead limiting itself to the evidence contained in the state court record.  Our review of the District Court's legal conclusions is therefore plenary, and we evaluate "'the state courts' determinations under the same standard that the District Court was required to apply.'" *Lewis v. Horn*, 581 F.3d 92, 100 (3d Cir. 2009) (quoting *Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009)).

Review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2241 *et seq.  Hardcastle v. Horn*, 368 F.3d 246, 254 (3d Cir. 2004) (petitions filed after April 1996 subject to AEDPA standards).  For inmates such as Williams, who are incarcerated by the state, AEDPA prohibits federal court relief on claims which have not been presented to the state's tribunals.  *See* 28 U.S.C. § 2254(b).  If a petitioner's claim has been adjudicated on the merits in state court, habeas relief is precluded unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d).  Thus, AEDPA erects "'a substantially higher threshold' for obtaining relief than *de novo* review."  *Renico v. Lett*, --- U.S. ---, 130 S. Ct. 1855, 1862 (2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-

court decision applied clearly established federal law erroneously or incorrectly," *Williams v. Taylor*, 529 U.S. 362, 411 (2000); relief instead requires a determination that the state court's application was unreasonable, *Renico*, --- U.S. ---, 130 S. Ct. at 1862.

In addition, AEDPA endows a state tribunal's findings of fact with a "presumption of correctness," and this presumption extends "to the factual determinations of state trial and appellate courts." *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1) and *Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir. 1996)). To overcome the presumption, a habeas petitioner must proffer clear and convincing evidence to show that a factual determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding."[7] *Miller-El*

---

[7] Section 2254(e)(1) refers to a state court's specific factual determinations—in other words, the discrete findings that "are subsidiary to the ultimate decision." *Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004). These findings may be set aside only upon a showing that there is clear and convincing evidence to the contrary. A challenge to the state courts' ultimate factual determination proceeds under § 2254(d)(2). That section, which refers to "an unreasonable determination of facts in light of the evidence presented in the State Court proceeding," requires a federal habeas court to "assess whether the state court's determination was reasonable or unreasonable" given the totality of the evidence adduced in the state tribunal. *Lambert*, 387 F.3d at 235. A challenge to the state court's individual findings of fact under § 2254(e)(1) may be based "wholly or in part on evidence outside the state trial record." *Id.* However, "even if a state

16

*v. Cockrell*, 537 U.S. 322, 340 (2003).  Our review proceeds under this AEDPA rubric.

## A     *Batson* **Claim**

Williams, who is an African American male, argues that the Commonwealth's use of peremptory challenges during jury selection violated *Batson v. Kentucky*, 476 U.S. 79 (1986).  In *Batson*, the Supreme Court held that deliberate or purposeful exclusion of African Americans from jury service violates the Equal Protection Clause.  *Batson*, 476 U.S. at 84.  The decision set forth a three-step procedure for evaluating claims of discrimination in the jury selection process:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.   Third,   in   light   of   the   parties' submissions,   the   trial   court   must   determine whether   the   defendant   has   shown   purposeful discrimination.

---

court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2)." *Id.* at 235–36.

*Miller-El*, 537 U.S. at 328–29 (discussing three-step inquiry and citing *Batson*, 476 U.S. at 96–98). *Batson* was handed down in April 1986—four months after the jury was empaneled to hear the Norwood murder trial. However, because Williams' conviction was pending on direct review at the time *Batson* was decided, its holding applies retroactively to jury selection in the Norwood case. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). We thus begin our review of Williams' *Batson* claim by reconstructing the voir dire, which commenced on January 6, 1986.

Each party was afforded a total of twenty peremptory challenges. The Commonwealth exercised its first two strikes on African American venirepersons; this prompted Panarella to object and led to the following exchange:

> MR. PANARELLA: Your Honor, I'm not sure of the case but there was a recent case which dealt with an attempt by the State or the Commonwealth to systematically exclude blacks from the jury. I think it would be appropriate if we were to ask the Commonwealth on what basis they exercised the peremptory challenge.
>
> THE COURT: Anything you want to say?
>
> [PROSECUTOR]: No, your Honor, and I might point out that the defense has exercised its peremptory challenges. I believe that this may be only the first challenge that I have

18

exercised at all.

THE COURT: So far, the defense has challenged peremptorily two persons who, incidentally, both of whom were white. The Commonwealth has peremptorily challenged two persons who, incidentally, both of whom are black. The Court is very cognizant of the law in that area; however, at this point, I can see nothing that suggests that the peremptory challenges are being based on race alone. I'm not going to ask the Commonwealth to set forth the reason; however, I will ask Miss Foulkes if the peremptory challenges are being based on race alone?

[PROSECUTOR]: Absolutely not, your Honor. I might suggest they are not being based on race at all.

THE COURT: Thank you very much. The record will reflect your objection.

The Commonwealth then used its next two peremptory challenges to strike two more African American members of the venire. Panarella objected a second time, stating, "I have raised an objection with respect to how she has raised her

19

peremptory challenges."[8]  The trial judge then stated,

> With respect to your objection concerning the use of peremptory challenges, that is your right and if there's anything you want to say further regarding that, you are free to say it. . . . You made your position plain the last time, Miss Foulkes, and I continue to accept that you are challenging people without respect to race but with respect to what other determinations you choose to make which you believe to be right under the law.

In response, the prosecutor, Andrea Foulkes, simply noted that "the record will speak for itself."

The Commonwealth thereafter struck ten additional African American venirepersons.  Panarella did not object to the exercise of any of these strikes.  In sum, fourteen of the sixteen peremptory challenges exercised by the prosecutor were utilized to dismiss African Americans.  She struck fourteen of the nineteen African American venire members that she had the opportunity to peremptorily dismiss.  In contrast, Foulkes struck only two of the twenty-one white individuals she had the opportunity to peremptorily excuse.

---

[8] The Commonwealth argues that Panarella's statement does not constitute an objection.  This assertion is belied by the record.  The trial judge himself characterized the statement as an "objection," and certainly responded in a manner indicating that he was ruling on a formal objection.

At the conclusion of voir dire, the trial court empaneled a jury composed of five black jurors and seven white jurors.

Williams did not advance a *Batson* challenge on direct appeal. He did, however, raise the issue in his PCRA petition. Williams' petition also asserted that his trial counsel was ineffective "for failing to insist that [the prosecutor] provide race neutral reasons for her challenges," and that appellate counsel was ineffective for neglecting to raise a *Batson* claim on direct appeal. In April 1998, twelve years after jury selection in the Norwood murder trial, the PCRA court held an evidentiary hearing on the issue.

At the outset of the hearing, the PCRA court provided Williams with several pages of notes that the judge had taken during voir dire.[9] The court summarized its notes for the record:

> There were 111 prospective jurors called. That's [the] total composition of the jury panel from which the jury was selected. Of those 111, 68 were white and 43 were black. The composition of the jury, the 12 principal jurors, was 7 white and 5 black. Total perempts—

---

[9] Williams was tried in the Philadelphia Court of Common Pleas before the Honorable David N. Savitt, Jr. Pursuant to 42 Pa. Cons. Stat. § 9545, jurisdiction over a PCRA proceeding lies in the Common Pleas court. Accordingly, Judge Savitt also presided over Williams' petition for collateral relief.

> neither side used the full quota of 20 perempts. The total perempts were 35, 18 of which were applied to white prospective jurors, 17 to black prospective jurors.
>
> The Commonwealth utilized 16 peremptory challenges, 2 of white jurors, 14 of black jurors. The defense used 19 peremptory challenges, 16 of white jurors, 3 of black jurors.

Williams then called Foulkes to the stand. She provided an explanation for each of her peremptory challenges and stated that she "categorically did not" strike any venireperson on the basis of race. Foulkes also testified that in order to prepare for the PCRA hearing, she reviewed a transcript of voir dire as well as the handwritten notes that she took during jury selection. After reviewing both the transcript and the notes, Foulkes created a one-page document that summarized, to the best of her recollection, the rationale behind each peremptory challenge. She used this summary to aid her PCRA testimony, though she acknowledged that she was unable to remember each of her reasons for exercising a strike. Williams' counsel was provided a copy of the one-page summary and used it to question Foulkes during the hearing.

In addition, Williams moved for production of the handwritten notes that Foulkes took contemporaneous with voir dire. He argued that production of the notes was necessary so that he could discover whether Foulkes recorded the race of each potential juror, and to check the veracity of her testimony. The PCRA court reviewed the

22

contemporaneous notes *in camera* and thereafter denied Williams' request. According to the court, the notes contained

> nothing [] that needs to be supplied to defense counsel or to be made part of the record. Miss Foulkes was called by the defense and testified fully and completely using, in a very limited way, the notes that are the subject of this inquiry to refresh her recollection. Under the circumstances, . . . no further discovery is warranted.

In a written order dated January 13, 1999, the PCRA court denied Williams' *Batson* challenge, concluding that he had failed to make out a prima facie case at step one of *Batson*'s three-step analytical framework.[10] Williams appealed, and the Pennsylvania Supreme Court ruled that the *Batson* claim was waived because it was not presented on direct appeal. It then turned to the derivative ineffective assistance of counsel claims. To assess these claims, the court looked to the underlying *Batson* challenge. Under Pennsylvania law, as set forth in *Commonwealth v. Uderra*, 862 A.2d 74 (Pa. 2004), the failure to raise a *Batson* objection during voir dire deprives a petitioner of *Batson*'s three-step burden-shifting procedure. A petitioner so deprived must instead shoulder the burden to prove actual, purposeful

---

[10] The PCRA court did not address Williams' derivative claims of trial and appellate counsel's ineffectiveness.

23

discrimination by a preponderance of the evidence. The Pennsylvania Supreme Court found that Williams' "trial counsel did not raise a *Batson* objection during *voir dire*," and thus the *Uderra* rule applied. *Williams II*, 863 A.2d at 514. It then determined that Williams had not marshaled evidence sufficient to prove actual, purposeful discrimination. *Id.* at 515. In other words, the Pennsylvania Supreme Court held that the underlying *Batson* claim was without merit. Because the *Batson* claim was meritless, Williams' trial and appellate counsel could not have been ineffective for failing to raise it. Finally, the court rejected Williams' contention that he was entitled to production of Foulkes' contemporaneous handwritten notes, concluding that he had "fail[ed] to demonstrate exceptional circumstances existed which required production of the actual notes." *Id.* at 515 n.10 (citing 42 Pa. Cons. Stat. § 9545(d)(2) ("No discovery, at any stage of proceedings under this subchapter, shall be permitted except upon leave of court with a showing of exceptional circumstances.")).

Williams' federal habeas petition presented both his *Batson* claim and the derivative claims of ineffective assistance of counsel. He also requested an evidentiary hearing and an opportunity to discover Foulkes' handwritten notes. The District Court denied Williams' request for discovery, addressed the *Batson* claim on its merits,[11] and

---

[11] The District Court correctly held that Williams did not procedurally default his *Batson* claim by failing to raise it on direct appeal. *See Wilson v. Beard*, 589 F.3d 651, 658 (3d Cir. 2009) ("As we have held on numerous occasions, in capital cases where the waiver occurred before the Pennsylvania Supreme Court made

held that the PCRA court unreasonably applied clearly established federal law when it concluded that Williams had not made a prima facie showing of racial discrimination at step one of the *Batson* analysis. Even so, the District Court found that the Commonwealth proffered clear and reasonably specific race-neutral reasons for its peremptory strikes and that, in the face of such a proffer, Williams was unable to show purposeful discrimination in the Commonwealth's selection of jurors. Therefore, the Court held that Williams' *Batson* challenge was without merit.

Williams contends that the District Court erred in three respects: first, it should have compelled production of the handwritten notes; second, it should have conducted an evidentiary hearing to allow Williams to question Foulkes regarding the content of the notes; and third, it should have concluded that the Commonwealth's use of peremptory challenges contravened *Batson*. The Commonwealth offers rejoinders to each of these arguments and identifies two alleged errors of its own. Specifically, the Commonwealth claims that (1) the Pennsylvania Supreme Court's application of the rule announced in *Commonwealth v. Uderra*, 862 A.2d 74 (Pa. 2004), is reasonable and governs the analysis of Williams' *Batson* challenge; and (2) even if the *Uderra* rule does not apply, the PCRA court reasonably concluded that Williams failed to make a prima facie showing of purposeful

_____

it clear that it would no longer apply the relaxed waiver rule, the waiver rule was not 'firmly established and regularly followed' and, therefore, the waiver is not an adequate basis for a finding of procedural default."). The Commonwealth does not contest this aspect of the District Court's opinion.

25

discrimination.[12]  We address each of these competing claims below.

### 1        Production of Prosecutor's Notes & Evidentiary Hearing

Williams argues that the PCRA court denied him a full and fair opportunity to litigate his *Batson* claim when it

---

[12] The Commonwealth also claims that under our recent decision in *Abu-Jamal v. Horn*, 520 F.3d 272 (3d Cir. 2008), Williams may only challenge the prosecutor's second peremptory strike, for this is the only strike to which he contemporaneously objected.  In *Abu-Jamal*, we held that a timely, contemporaneous objection is required in order to preserve a *Batson* issue for appeal.  520 F.3d at 284.  We explained that the failure to object during voir dire prevents the trial court from fulfilling responsibilities that are critical to the *Batson* framework, namely: evaluating the prosecutor's credibility and demeanor and, if necessary, promptly remedying defects in the selection process.  *See id.* at 281–82.  In this case, there is no question that Williams raised an objection after the Commonwealth exercised its second peremptory strike.  Williams then objected again following the prosecutor's fourth peremptory challenge.  By raising two objections during jury selection, Williams satisfied the contemporaneous objection requirement.  *See Lewis*, 581 F.3d at 102 (requiring "*a* timely objection" to preserve a *Batson* claim under *Abu-Jamal* (emphasis added)).  He unequivocally put the trial court on notice of his equal protection challenge and he allowed the court to inquire as necessary.  The court had an opportunity to evaluate the prosecutor and, if it deemed appropriate, to investigate the reasons underlying the strikes.  This is all that *Abu-Jamal* requires.  The Commonwealth's arguments to the contrary are without merit.

rejected his request to produce Foulkes' contemporaneous voir dire notes. He does not ask us to review the state court's evidentiary decision, but instead argues that under federal law, he is entitled to production of the notes so that he may pursue his § 2254 claims in federal court. Williams petitioned the District Court for production of the notes and for an evidentiary hearing in which to probe the rationale underlying the Commonwealth's exercise of peremptory challenges. The District Court denied both requests. Williams claims that this ruling was in error.

Discovery in § 2254 litigation proceeds according to Rule 6 of the Rules Governing § 2254 Cases. That provision states, "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Accordingly, habeas petitioners are entitled to discovery only upon a showing of "good cause," and even then, the scope of discovery is subject to a district court's sound discretion. *See Harris v. Nelson*, 394 U.S. 286, 299–300 (1969) (discussing pre-Rule 6 discovery standard); *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (explaining that Rule 6 was meant to be consistent with *Harris*); *see also Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d Cir. 1994) ("A district court sitting in a habeas case retains the discretion to permit additional discovery if the petitioner presents 'good cause' to do so."). A habeas petitioner may satisfy the "good cause" standard by setting forth specific factual allegations which, if fully developed, would entitle him or her to the writ. *See Harris*, 394 U.S. at 300; *see also Lave v. Dretke*, 416 F.3d 372, 380 (5th Cir. 2005). The burden rests upon the petitioner to demonstrate

27

that the sought-after information is pertinent and that there is good cause for its production. R. 6(b) R. Gov. § 2254 Cases; *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004); *Murphy v. Johnson*, 205 F.3d 809, 814–15 (5th Cir. 2000).

We review the District Court's denial of a discovery request for abuse of discretion. *Smith v. Mahoney*, 611 F.3d 978, 997 (9th Cir. 2010); *Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007); *Williams*, 380 F.3d at 974; *United States v. Roane*, 378 F.3d 382, 403 (4th Cir. 2004); *Newton v. Kemna*, 354 F.3d 776, 783 (8th Cir. 2004); *see also Bracy*, 520 U.S. at 909. A district court abuses its discretion when discovery is "'essential for the habeas petitioner to develop fully his underlying claim.'" *Mahoney*, 611 F.3d at 997 (quoting *Dung The Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005)).

The PCRA court afforded Williams considerable latitude to develop the facts underlying his *Batson* challenge during collateral proceedings. Williams was granted a six-day evidentiary hearing; he called Foulkes to the stand and conducted an extensive examination; he was provided with a one-page document, created by Foulkes, summarizing her concerns with each of the venire members that she struck; and he was given several pages of the trial court's voir dire-related notes. What is more, although Williams was not supplied with Foulkes' handwritten voir dire notes, he was expressly permitted to question the prosecutor regarding that which she recorded in those notes.

On direct examination, Foulkes described the content

28

of her handwritten notes as follows:

> I took notes with respect to each individual prospective venire person as they came up and as they spoke. My process of thinking requires contemporaneously writing. It's just something that I do. And what I wrote down were principally what it was that they said. It's that simple. If there was something overtly extraordinary about the witness that I observed, I would also write that down, but not always, and that was not always necessary, and whatever I didn't write down would also be reflected on the record.

Foulkes later explained that she "mostly wrote down things like location, age, whether they had children, where they worked, the things that we ask in voir dire routinely." Thus, according to Foulkes, much of what she recorded in her notes was also reflected in the record; in other words, the information was readily available for Williams to use as he mounted his collateral attack.

When Williams queried whether Foulkes recorded each prospective juror's race, the prosecutor replied that she generally did not, stating

> No, I don't believe I did. I would record both black and white jurors in the couple of occasions that I recorded race at all. I recorded them more or less equally for black and white

29

jurors, and I don't think I did it beyond the first few prospective jurors, and then I just stopped doing it. It wasn't necessary, certainly, to do it.

Of course, the PCRA judge heard Foulkes' testimony and her description of the notes' contents. When he later examined the notes *in camera*, he was aware of the prosecutor's representations, as well as Williams' specific concerns regarding the veracity of those representations. Yet, the court stated on the record that it found "nothing [in the notes] that needs to be supplied to defense counsel or to be made part of the record." Furthermore, the court characterized Foulkes' testimony regarding her notes as "full" and "complete," and ruled that "no further discovery is warranted."[13]

---

[13] Prior to the PCRA court's *in camera* review, Williams' counsel made several oral requests for production of the notes. His arguments in favor of production were clear and well stated. Foremost, he was concerned that Foulkes was not disclosing the complete contents of the notes. Thus, counsel argued, "I should not be in a position, with all due respect to the witness and her high office, of taking her word for it. She's got notes; I should be allowed to look at her notes. She's just like any other witness. And I can't—as my client's attorney, I'm charged with a responsibility to not take her word for it. My job is to get the notes so I can check the veracity of her answers, and that's why I've sought the notes." Counsel was also interested in evidence of Foulkes' thought process. He argued, "She may have a pattern of what she recorded that could reflect what she thought at the time she exercised her strikes." Both of these contentions were proffered directly prior to the PCRA court's *in camera* review.

30

Williams now essentially asks that we disbelieve the PCRA court, yet he presents us with no fact-based reason to do so. Instead, he argues that the notes are imperative so that he may inquire into the prosecutor's state of mind. His argument proceeds as if he has never had such an opportunity. But Williams has subjected Foulkes to cross examination on precisely this point. He has also discovered a summary compilation of the motives underlying her strikes. The PCRA judge compared this summary, *in camera*, to Foulkes' raw notes, and pronounced it a "full" and "complete" disclosure. Thus, Williams has already been afforded significant opportunity to discover the prosecutor's state of mind; he fails to set forth, in a colorable manner, exactly what he lacks.

Ultimately, Williams' request amounts to an entreaty to engage in a fishing expedition. The law is clear, however, that such speculative discovery requests should be rejected. *See Murphy*, 205 F.3d at 814 ("Simply put, Rule 6 does not authorize fishing expeditions."); *see also Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987). The District Court reviewed the record of collateral proceedings, remarked upon the significance of both the PCRA court's *in camera* review and subsequent characterization of the notes, and ruled that Williams "received all the information he is constitutionally entitled to in order to proceed with his *Batson*

_____

When the PCRA court subsequently described the testimony as "full" and "complete," it was implicitly indicating that Foulkes testified truthfully about the notes' contents and that they contained no relevant, undisclosed indicator of her subjective motivation.

31

claim." The District Court did not abuse its discretion in reaching this conclusion.[14] *See Mahoney*, 611 F.3d at 997 (stating that a district court abuses its discretion when it denies discovery that is essential to development of the petitioner's claim).

In addition, the District Court did not abuse its discretion by denying Williams' motion for an evidentiary hearing. District courts have discretion to grant such hearings under § 2254(e)(2). *Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010); *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000). We have set forth two considerations to guide a district court when confronted with such requests: first, it "should determine whether the petition presents a prima facie showing which, if proven, would enable the petitioner to prevail on the merits of the asserted claim," and second, even

---

[14] The District Court incorrectly applied 28 U.S.C. § 2254(d) to Williams' request for production, holding that the PCRA court's "refusal to turn over the notes was not contrary to or an unreasonable application of clearly established federal law," and that the decision was "not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." Section 2254(d) applies only to a "substantive request for habeas relief" and not a discovery request. *Fahy v. Horn*, 516 F.3d 169, 180 (3d Cir. 2008). Application of § 2254(d) to a habeas discovery request surely imposes an overly stringent burden, one that a petitioner is unlikely to meet. The District Court's error is not fatal, however, for we exercise plenary review over the Court's legal conclusions, see *Lewis*, 581 F.3d at 100, and ultimately reach the same result under Rule 6.

if the petitioner satisfies this first criterion, the court "may decline to convene an evidentiary hearing if the factual allegations are 'contravened by the existing record.'"[15] *Palmer*, 592 F.3d at 393 (quoting *Schriro*, 550 U.S. at 474); *see also Morris v. Beard*, --- F.3d ---, 2011 U.S. App. LEXIS 1551, at *28 (3d Cir. Jan. 26, 2011) ("'[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief,' no evidentiary hearing is required." (quoting *Schriro*, 550 U.S. at 474)). Moreover, we have stressed that "courts [should] focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell*, 209 F.3d at 287.

The District Court held that an evidentiary hearing would not advance Williams' *Batson* inquiry. Williams was afforded a full and complete hearing in the PCRA court. He was provided with the trial court's voir dire notes, as well as a document summarizing the motivation for each of the Commonwealth's peremptory strikes. The prosecutor appeared for several hours of testimony, almost all of which

---

[15] "Under § 2254(e)(2), 'a habeas court is barred from holding an evidentiary hearing unless the petitioner was diligent in his attempt to develop a factual basis for his claim in the state court.'" *Morris v. Beard*, --- F.3d ---, 2011 U.S. App. LEXIS 1551, at *19 (3d Cir. Jan. 26, 2011) (quoting *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010)). Williams diligently pursued—and obtained—an evidentiary hearing in the PCRA court, during which his *Batson* claim was explored in detail. He is therefore not barred from seeking an evidentiary hearing in federal court.

centered upon her voir dire strategy and state of mind. She proffered an explanation for each of her challenges and supported most of these explanations by reference to the record. The racial composition of the venire and jury was clearly established. In short, the PCRA proceeding was comprehensive. Williams identifies no potential facts which a second evidentiary hearing is likely to unearth. The District Court quite accurately observed that "[n]o additional, relevant information would be gained from a federal hearing that cannot be gleaned from the state court record." We agree. *See Morris*, --- F.3d ---, 2011 U.S. App. LEXIS 1551, at *29–30 (explaining that an evidentiary hearing is warranted only if there are "critical issues of material fact" that remain unresolved). The District Court's rejection of Williams' discovery requests will be affirmed.

## 2    Application of the *Uderra* Rule

On collateral appeal, the Pennsylvania Supreme Court determined that Williams waived his *Batson* claim because, as a matter of fact, "trial counsel did not raise a Batson objection during voir dire." *Williams II*, 863 A.2d at 514. This was an unreasonable determination of facts in light of the evidence presented in the state court proceeding. The trial record is plain—and both parties agree—that Williams objected after the Commonwealth used its second peremptory challenge to dismiss an African American venireperson. Williams objected a second time after Foulkes exercised her fourth strike. Thus, the Pennsylvania Supreme Court's fact-finding is clearly contradicted by the record. As a result of its mistake of fact, the Court did not address the *Batson* claim on

34

its merits.

The Pennsylvania Supreme Court did, however, indirectly address the *Batson* claim through its ineffective assistance inquiry. Specifically, Williams argued that trial counsel was ineffective for failing to insist that the Commonwealth provide race-neutral reasons for its challenges, and that appellate counsel was ineffective for neglecting to raise a *Batson* challenge on direct appeal. To assess the ineffective assistance claims, the Supreme Court queried whether Williams' underlying *Batson* challenge was meritorious. It ultimately answered in the negative after applying its then-recent precedent, *Commonwealth v. Uderra*, 862 A.2d 74 (Pa. 2004). *Uderra* held that when a post-conviction petitioner fails to raise an adequate *Batson* challenge at trial, he or she is not entitled to rely upon *Batson*'s burden-shifting framework in a collateral attack; rather, the petitioner must prove actual, purposeful discrimination by a preponderance of the evidence. *Uderra*, 862 A.2d at 86–87. In Williams' case, the Pennsylvania Supreme Court held that the evidence did not meet the threshold mandated by *Uderra*. The court thus determined that the underlying *Batson* challenge lacked merit and, accordingly, rejected both ineffective assistance claims. *Williams II*, 863 A.2d at 514–15. Neither ineffective assistance claim is before us today.

The Commonwealth argues that the Pennsylvania Supreme Court's application of the *Uderra* rule is reasonable and must therefore guide our inquiry into the merits of Williams' *Batson* challenge. In other words, the

35

Commonwealth argues that we should not apply the three-step *Batson* framework, but should instead simply ask whether Williams proved racial discrimination by a preponderance of the evidence. We disagree. As explained above, the Pennsylvania Supreme Court determined that Williams waived his *Batson* claim; thus, it did not apply *Uderra* to the claim. In fact, it did not address the claim at all. *See Laird v. Horn*, 414 F.3d 419, 424 (3d Cir. 2005) (critiquing contention that a state court implicitly addresses the merits of a claim when it rules on a derivative ineffective assistance of counsel claim). What is more, the Pennsylvania Supreme Court's waiver holding is premised on an unreasonable determination of facts, namely: the faulty finding that Williams failed to raise a *Batson* objection during voir dire. Given these circumstances, we need not assess the appropriateness of the *Uderra* rule, nor will we express an opinion on whether it represents an unreasonable application of *Batson*. We now turn to the merits of this equal protection challenge.

### 3    *Batson* Merits

The PCRA court denied Williams' *Batson* claim on the merits: it held that there was insufficient evidence from which to infer that the Commonwealth exercised its peremptory challenges in a racially discriminatory manner. As noted above, the Pennsylvania Supreme Court did not address this substantive determination, but instead resolved Williams' *Batson* claim on procedural grounds. The Supreme Court's procedural resolution is the only decision entitled to preclusive effect. *See Thomas*, 570 F.3d at 115. Thus, for

36

purposes of AEDPA, the Pennsylvania state courts have not adjudicated the *Batson* claim on the merits. *See id.* at 114–15; *see also Lewis*, 581 F.3d at 100 (explaining that when a state court's final resolution of a claim is based on procedural grounds, that claim has not been "adjudicated on the merits" for purposes of § 2254(d)). No AEDPA deference is due by this Court.[16] *Lewis*, 581 F.3d at 100.

A *Batson* challenge presents a mixed question of law and fact on federal habeas review. *Hardcastle*, 368 F.3d at 254; *Holloway v. Horn*, 355 F.3d 707, 719 (3d Cir. 2004). When AEDPA deference does not apply, we review a mixed

---

[16] The District Court incorrectly afforded AEDPA deference to the PCRA court's substantive resolution of the *Batson* claim. The District Court concluded that, although the Pennsylvania Supreme Court did not adjudicate the claim on the merits, the state courts—in this case, the PCRA court—had resolved the claim on substantive grounds, and thus there was an "adjudication on the merits" under § 2254(d). An "adjudication on the merits" can, of course, occur at any level of the state courts. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). When the state supreme court finally resolves a claim on procedural grounds, however, the substantive determination of a lower state court is stripped of its preclusive effect. *Id.* A substantive determination that lacks preclusive effect is not an "adjudication on the merits." *Id.* at 114 (explaining that an "adjudication on the merits" is "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground" (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001))). As a result, the PCRA court's *Batson* ruling was not an "adjudication on the merits."

question of law and fact de novo. *Lewis*, 581 F.3d at 100. However, any of the state courts' pure factual determinations, whether explicit or implicit, retain the presumption of correctness mandated by AEDPA. *See id.*; *see also* § 2254(e)(1); *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009). *Batson* announced a three-step burden-shifting framework for judges to employ in order to determine whether racial discrimination is at work in jury selection. That procedure, which we have set forth above, requires a defendant to make out a prima facie case of purposeful discrimination before the prosecutor must articulate race-neutral justifications for her strikes. *Miller-El*, 537 U.S. at 328 (citing *Batson*, 476 U.S. at 96–98). After the parties have satisfied their respective burdens of production in these first two steps, the defendant must prove purposeful discrimination by a preponderance of the evidence. *See id.* at 328–29 (citing *Batson*, 476 U.S. at 98).

Establishment of a prima facie case requires the defendant to show that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94). This step is not intended to be particularly onerous, and "the defendant is entitled to rely on the fact . . . that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." *Abu-Jamal v. Horn*, 520 F.3d 272, 288 (3d Cir. 2008) (quoting *Batson*, 476 U.S. at 96). That said, we have emphasized that "peremptory strikes are presumptively valid" and "need not be supported by any reason" so long as they are not "exercised on an unconstitutional basis, such as

38

race or gender." *United States v. DeJesus*, 347 F.3d 500, 505 (3d Cir. 2003).

The Supreme Court has identified at least two examples of circumstances relevant to step one's totality inquiry. First, the defendant may proffer evidence that the government exercised a "'pattern' of strikes against black jurors included in the particular venire, [which] might [then] give rise to an inference of discrimination." *Batson*, 476 U.S. at 97. Second, "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose."[17] *Id.* In the instant matter, the venire was 39% African American. The Commonwealth exercised a total of sixteen peremptory challenges; fourteen of those were used to remove African American members of the venire. Thus, the prosecutor struck African Americans at a rate of 87.5%, but struck white venirepersons at a rate of 12.5%. The District Court called this pattern "stark" and held that these statistics alone were sufficient to make out a prima facie case. That ruling is consistent with our precedents.

Statistical evidence may be sufficient by itself to make out a prima facie case of racial discrimination. *See, e.g.*,

---

[17] Jurisprudence in this circuit has "identified several additional relevant factors, including how many members of the cognizable racial group are in the venire panel; the nature of the crime; and the race of the defendant and the victim." *Lewis*, 581 F.3d at 103 (internal quotations omitted).

*Jones v. Ryan*, 987 F.2d 960, 971 (3d Cir. 1993); *Overton v. Newton*, 295 F.3d 270, 278 & n.9 (2d Cir. 2002) (citing cases and stating "statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite *prima facie* showing under *Batson*"). In *Holloway v. Horn*, we had "little difficulty" finding a prima facie case when the prosecutor used eleven of twelve strikes to remove African American venirepersons. 355 F.3d at 722. Similarly, we found a prima facie showing in *Brinson v. Vaughn*, where the Commonwealth used thirteen of its fourteen strikes to remove African Americans. 398 F.3d 225, 234–35 (3d Cir. 2005). Additionally, our decision in *Hardcastle v. Horn* strongly implies that a prosecutor who removes twelve of fourteen African American venire members exhibits a pattern of strikes sufficient to raise an improper inference. *See* 368 F.3d at 256.

In each of these decisions, however, we were unable to fully reconstruct the racial composition of the venire. Reconstruction of the venire often provides crucial context to a prosecutor's strike rate. *See Abu-Jamal*, 520 F.3d at 291–92. For example, a strike rate of 90% looks less stark when the venire is 90% African American. When the record does not illuminate the composition of the venire, there may be insufficient evidence with which to mount a successful collateral attack. Indeed, we rejected the petitioner's challenge in *Abu-Jamal* when he established that ten of the prosecutor's fifteen peremptory strikes were used to remove African Americans, but was unable to reconstruct the composition of the venire. *See id.* at 291–92.

40

What is telling about *Holloway*, *Brinson*, and *Hardcastle*—in contrast to *Abu-Jamal*—is that the pattern of strikes in these cases was sufficient to satisfy the prima facie threshold even without evidence of the venire's racial makeup. In each case, the strike rate exceeded 85%, whereas the rate in *Abu-Jamal* was 66.7%. Here, the strike rate also exceeded 85%; consistent with *Holloway*, *Brinson*, and *Hardcastle*, we find that evidence of the strike rate alone satisfies Williams' prima facie showing. After all, the Commonwealth exercised fourteen of its sixteen peremptory challenges on African Americans. In a venire that was less than 40% black, it is hardly a leap to conclude that a strike rate of 87.5% raises an inference of discrimination.

Although the strike rate data is sufficient by itself to make a prima facie showing in this case, we need not rely exclusively on the Commonwealth's strike rate. Evidence contrasting the rate at which the prosecution accepts black and white jurors may also raise an inference of discrimination. In *Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008), the prosecutor accepted between 41% and 47% of the black venirepersons that he had the opportunity to strike; his acceptance rate for white members of the venire was 83%. We held that the disparity between these acceptance rates was sufficient to make out a prima facie case at step one of the *Batson* analysis. *Bond*, 539 F.3d at 270. In this case, Foulkes accepted five of the nineteen African Americans she had the opportunity to strike. Her acceptance rate was thus 26.3%. By contrast, she accepted nineteen of the twenty-one white venirepersons she had the opportunity to strike. Her acceptance rate for white venire members was therefore 90%.

41

Under *Bond*, this disparity raises an inference of discrimination.

In sum, Williams has proffered statistical evidence sufficient to suggest that the Commonwealth's peremptory challenges were based upon an improper motive. We must therefore proceed to step two and three of the *Batson* inquiry. The government's burden of production at step two is "relatively low," *Hardcastle*, 368 F.3d at 257; "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral," *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). At the PCRA hearing, Foulkes provided an explanation for each of her strikes. Williams does not contend that any of Foulkes' reasons were facially illegitimate. Nonetheless, we have reviewed the record and conclude that the proffered reasons, some of which are discussed in more detail below, are facially race-neutral. The burden therefore rests upon Williams to prove that the explanations offered by Foulkes are not persuasive and are instead pretextual. *See Miller-El*, 537 U.S. at 338–39 (stating that step three of the *Batson* framework centers upon "the persuasiveness of the prosecutor's justification").

At step three of the *Batson* analysis, the petitioner must show that "it is more likely than not that the prosecutor struck at least one juror because of race." *Bond*, 539 F.3d at 264. To determine whether the petitioner has carried his or her burden, the court must evaluate "all evidence introduced by each side (including all evidence introduced in the first

42

and second steps) that tends to show that race was or was not the real reason" for each strike. *Hardcastle*, 368 F.3d at 259 (quoting *Riley v. Taylor*, 277 F.3d 261, 286 (3d Cir. 2001) (en banc)); *see also Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (explaining that "all of the circumstances that bear upon the issue of racial animosity must be consulted"). Step three ultimately focuses upon the prosecutor's subjective motivation, which ideally includes an assessment of the demeanor and credibility of the various voir dire participants. *See Snyder*, 552 U.S. at 477 ("Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenges." (alteration in original) (internal citations and quotation marks omitted)). To the extent that such assessments factor into the court's final ruling, they must be accorded significant deference on appeal. *See id.* at 477; *DeJesus*, 347 F.3d at 507.

As we have stated, the PCRA court made no step-three findings. The parties nonetheless developed a significant record at the PCRA hearing and, while this is a very imperfect substitute for a trial judge's findings of fact, it permits sufficient—though hardly ideal—collateral review. In the District Court, Williams proceeded by method of comparing stricken members of the venire to individuals the Commonwealth deemed acceptable. We have previously authorized such an evaluative procedure, explaining, "A comparison between a stricken black juror and a sitting white juror is relevant to determining whether the prosecution's asserted justification for striking the black juror is pretextual."

43

*Riley*, 277 F.3d at 282; *Holloway*, 355 F.3d at 724; *see also Snyder*, 552 U.S. at 479–86 (performing comparative analysis); *Miller-El v. Dretke*, 545 U.S. 231, 241–52 (2005) (finding *Batson* violation based in part on juror comparison). An explanation that appears race neutral at step two may betray an improper motive if it is invoked to strike African Americans but not other non-black venirepersons exhibiting the same characteristic. Williams focuses upon five stricken members of the venire, all of whom were African American. We will confine our comparative inquiry accordingly.

**Lucille Dozier.** Ms. Dozier was asked whether she had any beliefs which would prevent her "from being able to impose the death penalty in an appropriate case." She answered, "I would have to be absolutely certain, sure that this person really deserves that." After the prosecutor rephrased the question, Dozier stated that she could impose the death penalty if appropriate. At the PCRA hearing, Foulkes testified that she struck Dozier on the basis of her initial hesitancy. Foulkes explained, "[I]t appeared to me from her answers [that it would be] very difficult for her to apply the law in this case."

Williams names two comparators, both of whom were white: Debra Pagano, seated as juror number seven, and Virginia Feo, who was accepted by the Commonwealth but stricken by the defense. When Foulkes asked Pagano whether she would have any difficulty imposing the death penalty in an appropriate case, Pagano answered, "No." Feo was posed the same question and stated that although it would not be "easy," she "did not think" she would have any

44

difficulty imposing a penalty of death. Neither of these comparators expressed a sentiment close to that exhibited by Dozier; specifically, neither Pagano nor Feo required "absolute certainty" in order to recommend the death penalty. The comparative evidence thus fails to suggest that Foulkes' reason for striking Ms. Dozier was pretext.

**Shawn Kimble.** Mr. Kimble was employed as a purchasing agent, graduated from Central High School in west Philadelphia, and studied business at Drexel University. Foulkes observed that he was approximately the same age as Williams and, in her opinion, he exhibited a "hostile affect." Foulkes testified that she struck Kimble due to concerns about his attitude, his age, and because Williams asked Kimble no questions during voir dire. Furthermore, Foulkes explained that none of these factors alone moved her to exercise a challenge; rather, it was the combination of concerns that together led to the strike.

Because the PCRA court resolved the *Batson* claim at step one, it did not assess Foulkes' reasons for striking Kimble and, consequently, made no finding with respect to Kimble's alleged hostility. We cannot presume that the PCRA court credited Foulkes' assertion that Kimble displayed a hostile affect. *See Snyder*, 552 U.S. at 479 (declining to credit prosecutor's justification that stricken venireperson was excessively nervous when the state court did not make an on-the-record determination regarding venireperson's demeanor). As a result, we will not consider the prosecutor's demeanor-based reason for striking Kimble and will instead focus upon Foulkes' remaining justifications:

45

age and the defendant's decision not to question Kimble on voir dire.

Williams attacks these rationales by proffering two comparators to whom Williams posed no questions during voir dire, and who were nonetheless accepted by the Commonwealth. These two individuals—Isabelle Edmonson and Robert Eberle—do not constitute true comparators for purposes of our inquiry. Although Williams did not ask any questions of either Edmonson or Eberle, both were significantly older than the defendant. Therefore, neither can be said to exhibit the same characteristics as Kimble (age *and* lack of questioning). In a comparison analysis, it is insufficient to proffer venire members who lack one or more of the characteristics upon which the prosecutor exercised a strike. This is not to erect an unreasonable roadblock; rather, it ensures accuracy in an area often guided by guesswork and hunches. *See DeJesus*, 347 F.3d at 505 (explaining that a peremptory challenge "is usually based on educated guesses about probabilities based on the limited information available to an attorney about prospective jurors"). Because the focus in step three is to uncover a prosecutor's subjective motivation, it is imperative to account for the complete combination of factors that caused the prosecutor to exercise a strike. Here, it was Kimble's proximity to the defendant's age and the fact that defense counsel asked him no questions. Williams identifies no comparators that meet these criteria; therefore, his comparative evidence is unpersuasive.

**Geraldine Hill.** Ms. Hill was a married mother of five living in southwest Philadelphia. During voir dire, Foulkes

46

asked Hill, "would you surrender your belief merely because of the fact that other members of the jury, even a majority of the jury, would believe contrary to what you believe?"  Hill replied, "Either way I believe, no one, and I mean no one[,] would change my mind."  At the PCRA hearing, Foulkes explained her dismissal of Hill as follows:

> I have to say I can almost remember her saying this, I know that's rather remarkable, but she said that no one would change her mind if she came to a certain conclusion in the jury.  Again, the way she put it, the language that she used, was such that it was not sufficient to challenge her for cause, but the emphasis that she gave that response indicated to me that if she came to a conclusion, that she was not someone who was responsive to deliberating further with her fellow jurors.  And again, this is something that is a matter of affect and emphasis in the tone of how she delivered her answers.

Williams contends that Hill subsequently clarified her response, and that Foulkes' concerns were thus unreasonable. In particular, Foulkes later asked Hill, "So when you say that you make up your mind and that's it, that doesn't mean that you wouldn't be able to deliberate with your fellow jurors?" Hill answered, "No.  You will have to show me where I am wrong, either way.  As long as I can be shown."

There is no question that as a result of Hill's clarification, she could not be stricken for cause.  However,

47

Foulkes' lingering concern was not unreasonable. Hill's initial assertion that "no one, and I mean no one[,] would change my mind" is emphatic and suggests that she may have difficulty deliberating with other jurors. This is not to say that she would, in fact, have had difficulty participating in deliberations; but a peremptory strike is often no more than a guess about future behavior, *see DeJesus*, 347 F.3d at 505. A prosecutor—indeed, any trial advocate—has every reason to hedge against empaneling an individual who might prove unduly obstinate. What is more, Williams proffers no comparators for Hill, rendering our post-hoc comparative evaluation of little use. Given the guesswork inherent in the jury selection process, Hill's removal does not suggest improper motives.

**Lillie Moore & Dwayne Kitchen.** Ms. Moore was married, worked as a keypunch operator, and lived in the Logan section of Philadelphia. Mr. Kitchen was twenty-two, resided in north Philadelphia, and was employed as a construction worker. Foulkes asked both of these venire members whether they would require the Commonwealth to prove Williams' guilt "beyond all doubt." Both answered "Yes."[18] After the prosecutor posed the question to Kitchen, the court interjected: "I don't think that's an appropriate question, and I think that you ought to not ask it anymore." It is undisputed that Foulkes posed a question to several African American and white jurors that used similar "beyond all

---

[18] Subsequent clarifications by both Moore and Kitchen prevented each from being stricken for cause.

48

doubt" phrasing.

At the PCRA hearing, Foulkes testified that she struck Moore and Kitchen because it appeared to her that both individuals would "require[] proof beyond all doubt in a serious matter like this." The court pressed Foulkes on her explanation, asking, "[I]f a juror adhered to the fact that they couldn't follow the Court's instructions concerning reasonable doubt, then [wouldn't they] be available to be challenged for cause?" Foulkes indicated that although Moore and Kitchen were rehabilitated to the court's satisfaction, she believed both "were trying very hard to satisfy the Court in their answers, that in their heart [they] really simply couldn't hold the government to a different standard than [certainty beyond all doubt]."

By way of comparison, Williams proffers juror number 176, Gloria Mastronardo. Foulkes did not ask Mastronardo a question using the "beyond all doubt" phrasing; however, Williams argues that Mastronardo's opinions regarding the death penalty are comparable to those Foulkes attributed to Moore and Kitchen. The record does not support such a contention. If anything, Mastronardo expressed views that were somewhat more receptive to imposition of the death penalty. When asked whether she had any beliefs that might prevent her from recommending death, she stated, "I used to think I would *never be against capital punishment* but perhaps—it would depend on the nature of the crime, to be honest" (emphasis added). Foulkes later asked if Mastronardo was capable of "impos[ing] the death penalty." She answered, "I believe so." In short,

49

Mastronardo articulated none of the reservations that Moore and Kitchen expressed.  Furthermore, while Foulkes posed an improperly phrased question to both Moore and Kitchen, she posed similar questions to several other individuals of each race.  Williams cannot point to any venireperson who answered the "beyond all doubt" question like Moore and Kitchen, yet who Foulkes failed to strike.  We thus find no value in the comparative evidence.

Although Williams' juror-by-juror comparison evidence falls short, we are mindful that we must consider the totality of the available evidence, including that which was proffered at steps one and two of the *Batson* inquiry.  *See Hardcastle*, 368 F.3d at 259.  Here, Williams presents fairly strong strike-rate evidence: the prosecutor exercised fourteen of sixteen strikes to remove African Americans from a venire that was 39% black.  The rate at which she struck African Americans was 87.5%, compared to a strike rate of 12.5% for white venire members.  There are also less revealing statistics.  The Commonwealth accepted black venire members at a rate of 26.3%.  In *Bond v. Beard*, we held that at step three, an acceptance rate of 41-47% (compared to 83% for whites) was "reasonably high," and was evidence that the prosecutor was not racially motivated.  539 F.3d at 270.  While the acceptance rate in Williams' case is not equivalent to *Bond*'s, it is much higher than the 9% rate criticized by the Supreme Court in *Miller-El v. Dretke*, 545 U.S. at 240–41.  We find the acceptance rate data inconclusive at best.

The statistical data is but one portion of the totality that we must consider at step three.  Williams was tried by a

50

jury of five African Americans and seven white individuals. Both defendant and victim were African American and there was no racial component to the crime. *See Lewis*, 581 F.3d at 103 (explaining that the race of the defendant and victim, and the nature of the crime, may be relevant circumstances to consider); *Abu-Jamal*, 520 F.3d at 288 n.16 (same). These facts cut in the Commonwealth's favor. Furthermore, Williams' comparative evidence was exceedingly weak. Foulkes provided plausible reasons for each of her strikes, and supported her reasons by recourse to the record. More importantly, she was consistent in the application of her reasons; she did not, for example, accept white venire members who articulated a refusal to deliberate or who would require proof beyond all doubt to return a verdict of guilt. On the totality of the record before us, the evidence offered by Williams is simply insufficient to overcome the evidence that favors the Commonwealth.[19] Accordingly, Williams' *Batson*

---

[19] Williams makes passing reference to the infamous Jack McMahon training videotape, created in 1987 and featuring former Philadelphia Assistant District Attorney Jack McMahon. In the tape, which was intended as an educational tool for young prosecutors in the Philadelphia District Attorney's Office, McMahon makes several comments suggesting that he made conscious efforts to strike qualified African Americans from the venire. *See Wilson v. Beard*, 426 F.3d 653, 656–58 (3d Cir. 2005) (recounting in detail several of McMahon's more inflammatory comments). Since its public disclosure in 1997, many defendants have sought to bolster a *Batson* claim by recourse to the tape. *See, e.g.*, *Lewis*, 581 F.3d at 104; *Wilson*, 426 F.3d at 653; *Brinson v. Vaughn*, 398 F.3d 225 (3d Cir. 2005). In *Lewis*, we found the tape to be of little significance where the petitioner was unable to show that the district attorney responsible for his prosecution had seen

challenge fails on its merits.

## B        Accomplice Liability Instructions

Williams' second claim sounds in due process: he contends that the trial court's accomplice liability instructions permitted the jury to find that he was an accomplice to first degree murder without finding that he possessed the specific intent to kill.  Intent to kill is an element of first degree murder under Pennsylvania law.  18 Pa. Cons. Stat. § 2502(a). This element must be proved whether the defendant is the principal or merely an accomplice to the homicide.  *Everett v. Beard*, 290 F.3d 500, 513 (3d Cir. 2002) (explaining that "since the legislature drafted the law on first-degree murder, Pennsylvania law has clearly required that for an accomplice to be found guilty of first-degree murder, s/he must have intended that the victim be killed" (internal citations omitted)).  If, as Williams argues, the charge allowed the jury to find that he was an accomplice to first degree murder without finding that he possessed the *mens rea* required for that offense, then the instructions were constitutionally infirm, for due process requires that each element of the

---

the tape or followed its recommendations.  *See* 581 F.3d at 104. Similarly here, Williams cannot argue that Foulkes viewed the tape, for it was created at least one year after Williams' trial. There is no evidence that Foulkes was aware of McMahon-like practices which pre-dated the tape's creation or that she utilized such practices in any of her trials, let alone the Norwood murder trial.  Thus, we find the tape to be of no significance in the instant matter.

52

charged offense be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *see also Smith v. Horn*, 120 F.3d 400, 410 (3d Cir. 1997) (holding that petitioner stated a due process claim when he successfully argued that the trial court's jury instructions "had the effect of relieving the Commonwealth of its burden of proving beyond a reasonable doubt one of the elements of first-degree murder under Pennsylvania law").

Williams did not object to the accomplice liability instructions at trial, nor did he question this aspect of the charge in post-trial motions to set aside the verdict. He also did not raise the issue on direct appeal or in his PCRA petition. It was not until November 2001, when the collateral proceeding was pending before the Pennsylvania Supreme Court, that Williams filed a motion to remand to the PCRA court so that he might challenge the accomplice liability instructions. The Pennsylvania Supreme Court denied this motion. Williams raised the issue again in a second PCRA petition filed in 2005. The PCRA court dismissed this petition as untimely. *See* 42 Pa. Cons. Stat. § 9545 (requiring any PCRA petition, including a second or subsequent petition, to be filed within one year of the date that judgment becomes final). The Pennsylvania Supreme Court affirmed.

Williams then petitioned the District Court for habeas relief. The District Court held that Williams' claim was not time-barred because the PCRA's one-year statute of limitations was not firmly established and regularly applied at the time the default occurred. The Court proceeded to the merits and rejected Williams' accomplice liability claim. It

53

concluded that even if the charge contained constitutional error, it was harmless in light of the overwhelming evidence adduced at trial.

We begin by considering whether Williams procedurally defaulted his accomplice liability claim. The Commonwealth argues that the claim was untimely under state law and may not be reviewed by this Court. A federal habeas court cannot review a claim rejected by the state courts "'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, --- U.S. ---, 130 S. Ct. 612, 614 (2009) (alteration in original) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). State procedural rules, such as the PCRA's statute of limitations, are not an adequate bar to federal habeas review unless they were "'firmly established and regularly followed'" at the time the rule was contravened. *Wilson v. Beard*, 589 F.3d 651, 658 (3d Cir. 2009) (quoting *Bronshtein v. Horn*, 404 F.3d 700, 707 (3d Cir. 2005)). Williams ran afoul of the PCRA's statute of limitations when he failed to raise the accomplice liability claim in his initial petition for PCRA relief in 1996. *See Commonwealth v. Albrecht*, 994 A.2d 1091, 1093 n.2 (Pa. 2010). This default occurred well before October 20, 1998, the date by which the PCRA statute of limitations was firmly established and regularly followed. *See Morris*, --- F.3d ---, 2011 U.S. App. LEXIS 1551, at *12–13 (explaining that prior to October 20, 1998, Pennsylvania courts "refused to enforce procedural rules—such as the PCRA's one-year statute of limitations—in capital cases"); *Bronshtein*, 404 F.3d at 707–09 (same). Because the

54

procedural rule under which the state courts dismissed Williams' accomplice liability claim was not firmly established and regularly followed at the time of his default, it is an inadequate bar to federal habeas review. We will therefore proceed to the merits and consider the claim de novo. *See Lewis*, 581 F.3d at 100.

The propriety of the court's charge is closely intertwined with the evidence and argument brought forth at trial. Williams was tried alone. The Commonwealth argued that Williams and Draper perpetrated the killing together. Williams was portrayed as the principal. According to Draper, Williams hatched the plan to rob Norwood and recruited Draper to assist. Once the robbery was complete, it was Williams who decided to kill Norwood. To that end, he retrieved a tire iron and socket wrench with which to bludgeon Norwood's skull. Williams implored Draper to join him in this endeavor, and the two beat Norwood until he was bloody and lifeless. Simply put, Draper's account left no ambiguity regarding Williams' role as the principal in the offense.

This account was consistent with testimony supplied by other Commonwealth witnesses. Williams was seen driving Norwood's vehicle approximately one hour after the murder occurred. He told his friend Rucker that he "offed a guy" named Amos earlier that evening. Rucker observed blood stains on Williams' shoes. Before they parted ways on the night of the murder, Williams told Rucker that he was "going to get some gas from a gas station to go back to the scene of the crime." Police officers later discovered

55

Norwood's body in the cemetery, charred beyond recognition.

The Commonwealth's narrative sharply conflicted with Williams' account. He claimed that on the day of the murder, he had seen Norwood, Draper, and an acquaintance named Michael Hopkins riding in Norwood's blue Chrysler LeBaron. They apparently pulled up alongside Williams, and Draper indicated that they were headed to Draper's mother's residence on Roumfort Road. Williams asked for a ride because he happened to be going to a party in the same vicinity. When the foursome neared the cemetery, Draper and Hopkins—but not Williams—allegedly assaulted Norwood. Williams stated that he was unaware that his friends intended Norwood any harm. But when they initiated the assault, Williams allegedly became agitated, demanded that Draper and Hopkins abandon their criminal endeavor, and then exited the vehicle when they refused. Williams claimed that he then walked to the residence of an acquaintance and borrowed bus fare to return home. As Williams told it, he was not part of the robbery and was not present when Norwood was killed.

The jury was thus presented with a stark choice: either Williams was the principal in a first degree murder or he was ignorant of his friends' plans and nowhere near the cemetery when the killing occurred. Neither party argued that Williams was an accomplice to robbery or murder. Rather, both the prosecutor and defense counsel stressed their contrasting narratives. Foulkes was blunt: she called Williams "a person who commits atrocious, murderous, malicious acts and then spends the rest of his days lying,

covering up, . . . trying to make things seem as they're not." And she emphasized, over and over again, that Williams was a murderer who intended to kill. Defense counsel, by contrast, urged the jury to adopt Williams' version of events and attempted to demonize Draper as a liar. Several times he succinctly summarized the all-or-nothing proposition facing the jury: "If you believe Mr. Williams, you will acquit him of all charges." Accomplice liability was simply not in play.

In light of these conflicting accounts, the trial court's decision to provide an accomplice liability charge is rather curious.[20] Nevertheless, after charging the jury on the elements of various degrees of murder (and accompanying *mens rea* requirements), voluntary manslaughter, robbery, and criminal conspiracy, the court stated, in pertinent part,

> You may find a defendant guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime or even that he was personally present when the crime was committed.

> An accomplice is one who either plans, cooperates, assist[s], counsels or otherwise aids in the perpetration of the crime.

> A defendant is guilty of a crime if he is an

---

[20] During oral argument before the District Court, the parties were asked why the accomplice liability instruction was given. Neither could provide an answer.

accomplice of a person who commits that crime. The defendant does not become an accomplice merely by being present at the scene or knowing about the crime. He is an accomplice if, with the intent of promotion or facilitating commission of the crime, he solicits, commands, encourages or requests the other person to commit it or aids, or agrees to aid or attempts to aid the other person in planning or committing it.

However, a defendant is not an accomplice if before the other person commits the crime, he stops his own efforts to promote or facilitate the commission of the crime, and wholly deprives his previous efforts of effectiveness or gives timely warning to the law enforcement authority or otherwise makes a proper effort to prevent the commission of the crime.

You may find the defendant guilty of a crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed, and that the defendant was an accomplice of the person who committed it.

Williams argues that this instruction "unconstitutionally broadened the scope of accomplice liability" because it permitted the jury to find that he was an accomplice to first degree murder without finding that he possessed the specific

intent to kill.  If the theory of accomplice liability were a viable one in this case, Williams might have a point.  But it is not.  Accordingly, the trial court's charge reveals no deficiency of constitutional dimension.

To show that a jury instruction violates due process, a habeas petitioner must demonstrate both (1) that the instruction contained "some 'ambiguity, inconsistency, or deficiency,'" and (2) that there was "'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  *Waddington v. Sarausad*, 555 U.S. 179, 129 S. Ct. 823, 831 (2009) (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) and *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).  Satisfaction of this two-part inquiry requires a federal habeas court to "focus initially on the specific language challenged," *Smith*, 120 F.3d at 411 (citation and internal quotation marks omitted), and then to review the challenged instruction in the context of the entire charge and in light of the evidence and arguments presented at trial.  *Estelle*, 502 U.S. at 72 ("[T]he instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973))); *Waddington*, 555 U.S. 179, 129 S. Ct. at 833 (analyzing accomplice liability charge in light of parties' closing arguments).  In this fashion, a due process analysis depends as much on the language of the court's charge as it does on the particularities of a given case.  In other words, the inquiry requires careful consideration of each trial's unique facts, the narratives presented by the parties, the arguments counsel

59

delivered to the jurors before they retired to deliberate, and the charge as a whole. *See Waddington*, 555 U.S. 179, 129 S. Ct. at 831–33; *Estelle*, 502 U.S. at 72.

Here, even if the trial court's accomplice liability charge was in some respect ambiguous, there is no reasonable likelihood that the jury applied the instruction in a manner that relieved the Commonwealth of its burden of proof with respect to first degree murder. The trial record makes this point plain: all of the evidence and argument indicated either that Williams was the principal killer—with the specific intent to kill—or that he played no role in the robbery and murder. There simply was no viable third option. The charge as a whole reflected this stark choice. The court mentioned the concept of accomplice liability sparsely. Its first degree murder instructions did not mention the concept of accomplice liability at all.[21] Instead, the charge (rightly)

---

[21] The first degree murder instruction explained that the jury must first determine whether Williams participated in the murder and, if he did so, whether he acted with a *mens rea* sufficient to meet the first degree murder standard:

> If you find the *defendant* guilty of murder; that is, an unlawful killing with malice, you must then determine whether *he* is guilty of murder of the first degree, murder of the second degree, or murder of the third degree.
>
> Murder of the first degree is a criminal homicide committed with a specific intent to kill. . . .

focused on Williams' actions and mental state. Thus, although the court provided instruction on the theory of accomplice liability, it appears to have done so out of oversight or, perhaps, carelessness. In either event, the mere provision of this stray instruction does not alter the fact that accomplice liability was a theory for which there was no evidentiary support. By including the instruction in the final charge, the court did not violate Williams' right to due process.[22]

---

> Therefore, in order to find the *defendant* guilty of murder in the first degree, you must find that the killing was a willful, deliberate and premeditated act.

(emphasis added). The prosecutor's closing argument was consistent with these instructions. She repeatedly highlighted evidence of Williams' intent, stating, for example, "That, ladies and gentlemen, is murder in the first degree, because . . . his actions supply the inference that the defendant intended to take life[.] . . . [H]e expressed, by his action, a specific intention, above and beyond the robbery, to kill [Norwood], to kill him for the purpose whatever, for whatever purpose." In a due process challenge, a strong consistency between argument and charge makes it more likely that the jury understood the requirements of the law and applied those requirements correctly. *Cf. Smith v. Horn*, 120 F.3d 400, 404–05 (3d Cir. 1997) (finding infirmity when prosecutor urged jury to apply erroneous theory of accomplice liability).

[22] Williams suggests that even if provision of the accomplice liability instruction was unnecessary, we must nonetheless

61

Finally, Williams contends that the trial court's instruction was nearly identical to the accomplice liability instruction that we held to be constitutionally deficient in *Laird v. Horn*, 414 F.3d 419 (3d Cir. 2005). In *Laird*, co-defendants Laird and Chester left a bar along with a third individual named Milano. Milano's body was discovered the following evening in a nearby wooded area. Laird and Chester were tried together for, *inter alia*, murder, kidnapping, aggravated assault, false imprisonment, and conspiracy. Both took the stand and admitted that they participated in the kidnapping and were present for Milano's death. *Id.* at 422, 426. Each denied that he intended for Milano to be killed. *Id.* at 422. Laird accused Chester of killing Milano and vice versa. *Id.* at 422, 426. The jury convicted both defendants of an array of offenses, including first degree murder, kidnapping, aggravated assault, and conspiracy.

The trial court in *Laird* provided an accomplice liability instruction that was almost identical to the instruction given in Williams' case, but the similarities between the two proceedings essentially end there. *Laird* was a two-defendant trial wherein both of the accused admitted their participation

acknowledge the fact that the theory was presented to the jury. As such, the jury may have concluded that Williams was an accomplice to first degree murder. On habeas review, we do not deal in "may haves." The appropriate question is whether the outcome proposed by Williams was reasonably likely. *See Waddington v. Sarausad*, 555 U.S. 179, 129 S. Ct. 823, 831–32 (2009). Our answer to this question is a resounding No.

in some aspect of the crime—i.e., the kidnapping.  *See id.* at 426.  Neither co-defendant, however, admitted he was an accomplice to the actual homicide.   It was therefore imperative for the charge to distinguish between Laird's acknowledged role as an accomplice to kidnapping and his disputed role as accomplice to first degree murder.  Yet the trial court failed to make such a distinction, and failed to explain that an accomplice to kidnapping is not necessarily an accomplice to murder.  Given the circumstances present in the case, it was incumbent upon the trial court to ensure that the jury understood "that an accomplice for one purpose is [not] an accomplice for all purposes."  *Id.* at 427 (quoting *Smith*, 120 F.3d at 414).  To put it differently, under the *Laird* charge, the jury reasonably could have concluded that because Laird was an accomplice to kidnapping, he must also have been an accomplice to murder.

The problem in *Laird* was not the accomplice liability instruction's linguistic imprecision per se.   Rather, the instructional ambiguity worked a critical error when viewed in the context of the trial record as a whole.  Williams does not acknowledge this aspect of the holding.   Instead, he argues that the similarity of both instructions demonstrates constitutional error.   But as we indicated above, a rote comparison of the two instructions is insufficient in a due process inquiry.  *See Waddington*, 555 U.S. 179, 129 S. Ct. at 831–33; *Estelle*, 502 U.S. at 72.  Although the trial judge in *Laird* provided an accomplice liability instruction that was nearly identical to that rendered here, there was a profound difference between each proceeding's evidence, argument, and the charges as a whole.  That difference is dispositive.  In

63

*Laird*, the ambiguity in the charge, coupled with the balance of pertinent considerations, made it reasonably likely that the jury applied the instruction in a manner which relieved the Commonwealth of its burden of proof. There is no such likelihood here. Williams' testimony—unlike that provided by the co-defendants in *Laird*—attempts to exculpate him completely. Accomplice liability is simply not in play.

In sum, we find that the trial court's accomplice liability instruction was not constitutionally infirm. Williams' arguments to the contrary are without merit.[23]

## C        Ineffective Assistance of Counsel

Williams' final claim invokes the Sixth Amendment right to effective counsel. Under *Strickland v. Washington*, 466 U.S. 668 (1984), criminal defendants are entitled to effective representation at both the guilt and penalty phases of trial. To establish a constitutional violation under *Strickland*, a defendant must demonstrate that counsel's performance was deficient, and that it prejudiced the defense. *Id.* at 687–88. Where a *Strickland* claim is raised on federal habeas review, however, the petitioner must not only show deficient

---

[23] Williams also claims that both his trial counsel and his counsel on direct appeal were ineffective for neglecting to challenge the accomplice liability instruction. Because this claim lacks merit, neither counsel was ineffective for failing to pursue it. *See Premo v. Moore*, --- U.S. ---, 131 S. Ct. 733, 741 (2011); *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000).

performance and prejudice; in addition, he or she must show that "the state court's rejection of [the] claim of ineffective assistance of counsel was 'contrary to, or involved an unreasonable application of' *Strickland*, or it rested 'on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Porter v. McCollum*, --- U.S. ---, 130 S. Ct. 447, 452 (2009) (per curiam) (quoting § 2254(d)).

Williams contends that he received deficient legal representation during the trial's penalty phase. Specifically, he claims that Panarella—his trial counsel—failed to conduct a reasonable investigation into his background. Such an inquiry would have revealed extensive evidence of physical and sexual abuse, as well as sundry concerns with Williams' mental health. This evidence, in turn, could have been presented to the jury to mitigate the brutality of Williams' offense, or so the argument goes.[24] Panarella instead opted to

---

[24] Mitigating circumstances are set forth by statute under Pennsylvania law. *See* 42 Pa. Cons. Stat. § 9711(e). Had Panarella presented the evidence described above, Williams argues that the jury could have found either that he "was under the influence of extreme mental or emotional disturbance," § 9711(e)(2), or that his "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired," § 9711(e)(3). Williams also contends that the jury could have found that the "catch-all" mitigation provision set forth in § 9711(e)(8) was applicable. *See* § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.").

portray the defendant as a capable young man for whom the crime was but an aberration. He did not present evidence of sexual abuse or mental impairment, and there was only a passing reference to Williams' physically abusive stepfather. The jury evidently rejected Panarella's characterization, for it concluded that there were no circumstances that mitigated the severity of the offense.[25]

Williams raised this ineffective assistance of counsel claim in his petition for PCRA relief. Prior to ruling on the petition, the PCRA court heard several days of testimony. Three mental health experts testified that Williams was psychologically damaged at the time of the offense. At least eight additional witnesses took the stand and detailed the physical and sexual abuse to which Williams was subjected throughout his youth. Finally, Panarella testified concerning his performance at trial. At the conclusion of these proceedings, the PCRA court denied the ineffective assistance of counsel claim on its merits. The Pennsylvania Supreme Court affirmed, holding that Williams did not meet "his burden of demonstrating there was [a] reasonable probability the presentation of [prior abuse and mental health] evidence would have resulted in a life sentence instead of the death penalty." *Williams II*, 863 A.2d at 521 n.12.

---

[25] Most notably, the jury did not find that Williams' age was a mitigating factor in the offense. This finding is significant, and we address it in more detail below.

66

On federal habeas review, the District Court concluded that Panarella's penalty-phase performance was constitutionally deficient. The Court explained: "Panarella's efforts fell far short of . . . prevailing professional norms, and the explanations he provided during post-trial and PCRA hearings reflected inattention to the penalty phase rather than tactical decision making." On step two of the *Strickland* inquiry, however, the Court concluded that under AEDPA's deferential standard of review, it could not find that Panarella's performance was prejudicial to the defense. Accordingly, the District Court denied Williams' claim. We exercise plenary review over this decision. *See Lewis*, 581 F.3d at 100.

We will not revisit the District Court's determination that Panarella was constitutionally ineffective during the trial's penalty phase. We instead accept this finding for purposes of our present analysis and proceed to the prejudice inquiry. *See Wong v. Belmontes*, --- U.S. ---, 130 S. Ct. 383, 386 (2009) (per curiam) (assuming, for purposes of analysis, that counsel's performance was deficient when prejudice inquiry was dispositive). The Pennsylvania state courts resolved Williams' ineffective assistance claim on the merits; our review of the issue is thus governed by principles of AEDPA deference. *See Lewis*, 581 F.3d at 100. We apply these principles to the holding of the Pennsylvania Supreme Court because it provides "the 'last reasoned decision' of the state courts" on the *Strickland* claim. *Simmons*, 590 F.3d at 231–32 (quoting *Bond*, 539 F.3d at 289–90). Under § 2254, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v.*

67

*Richter*, --- U.S. ---, 131 S. Ct. 770, 785 (2011).  This means that a habeas petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance"; to prevail, the petitioner must demonstrate that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002); *see also Harrington* --- U.S. ---, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))).

To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.*  The *Strickland* prejudice standard is not "stringent"—it is, in fact, "less demanding than the preponderance standard." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (explaining that *Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered").  In a capital case arising from the Pennsylvania state courts, prejudice exists if there is a reasonable probability that, but for counsel's deficient performance, "one juror [would have] voted to impose a sentence of life imprisonment rather than the death penalty." *Bond*, 539 F.3d at 285 (citing 42 Pa.

68

Cons. Stat. § 9711(c)(1)(iv)).

A careful prejudice inquiry requires that we "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path." *Wong*, --- U.S. ---, 130 S. Ct. at 386. This includes evidence that was adduced at trial as well as that which was not presented until postconviction review. *See Porter*, --- U.S. ---, 130 S. Ct. at 454. Stated differently, we must reconstruct the record and assess it anew. In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony. *See Wong*, --- U.S ---, 130 S. Ct. at 390 (stating that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice"). Once we have reconstructed the record, we must "reweigh the evidence in aggravation against the totality of available mitigation evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Only then may we ask whether there is a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different.

Accordingly, we begin by reconstructing the record. We will then reweigh the totality of the evidence and assess whether Panarella's deficient performance prejudiced the defense.

## 1      Reconstructing the Record

69

The trial's penalty phase was a brief affair. For the Commonwealth, assistant district attorney Jeffrey Kolansky took the stand and supplied the basic facts regarding the Dorfman robbery. He stated that the incident occurred on December 24, 1982; that the victims were Don and Hilda Dorfman, aged sixty-nine and sixty-four, respectively; that Williams was sixteen years of age at the time of the offense; that Williams entered the Dorfmans' home carrying a .22 caliber Winchester rifle, pointed it at Mrs. Dorfman and fired it three times above Mr. Dorfman's head; and that Williams was convicted of two counts of first degree robbery, one count of burglary, one count of simple assault, one count of unauthorized use of an automobile, and one count of conspiracy. Next, Philadelphia police detective Lawrence Gerrard provided testimony pertaining to the Hamilton murder. He explained that the incident occurred on January 26, 1984; that Hamilton was stabbed approximately twenty times; that the murder weapon was left lodged in the back of Hamilton's neck; that Williams was seventeen years of age at the time of the offense; and that Williams was convicted of third degree murder, theft by unlawful taking, and possession of an instrument of a crime. Finally, Philadelphia Quarter Sessions court clerk Margie Frazier described the sentences imposed for each of these offenses.

Williams presented three witnesses: his mother, Patricia Kemp; his girlfriend, Marlene Rogers, and his first cousin, Willie Dino James. Each witness testified to Williams' general good nature and athletic success. In something of an understatement, the Pennsylvania Supreme Court found that this rather generic testimony was "not

compelling." *Williams II*, 863 A.2d at 520.

Kemp did provide limited evidence on cross examination regarding her son's childhood abuse. She denied abusing Williams herself—a point she would contradict ten years later at the postconviction proceeding—but she stated that Williams' stepfather, Ernest Kemp, was "abusive to my son." She continued:

> He [Ernest Kemp] didn't care about [Williams]. He accused my son of doing things, having girls in the room. That was a lie.
>
> My son would be asleep at night, and he [Ernest] would be drunk and he would come in and bust in the room and say he [Williams] has somebody in there, and my son had called my job, and I had told Terry to go down to Mom's. That's a lady on the street that helped me raise my son, Mrs. Easton, and I would send him down there with her because my husband [Ernest], that I am married to now, yes, was very abusive to Terry, was very nasty to Terry.
>
> He pushed Terry down a flight of steps because Terry was on the phone that I paid for.

Kemp was not asked to elaborate on these statements on redirect examination and no additional abuse testimony was elicited by either party.

71

In her closing argument, the prosecutor emphasized Williams' prior convictions and his predilection for violence. She underscored that Williams "has taken two lives, two innocent lives of persons who were older and perhaps unable certainly to defend themselves against the violence that he inflicted upon them." According to the Commonwealth, Williams was a violent individual whose behavior would have continued escalating had he not been apprehended.

Panarella's closing focused on his client's youth. He stressed the fact that Williams was only four months past his eighteenth birthday at the time he committed the offense and he explicitly asked the jury to find that age was a circumstance that mitigated Williams' culpability for the crime. Additionally, Panarella argued that Williams' life sentence would be one of extreme hardship; Williams would be deprived of the privileges of fatherhood, and he would be exposed to "all of the brutalities that are associated with prison life." Panarella concluded by appealing to the jury's sense of justice. He stated, "I ask you to spare Mr. Williams' life. I can say to you that justice is always tempered with mercy but let me say to you that inflicting the death sentence in this case, I believe, is inappropriate."

The jury rejected this plea. It determined that two aggravating circumstances were applicable: (1) the murder occurred during the commission of a felony (robbery), 42 Pa. Cons. Stat. § 9711(d)(6), and (2) Williams had a significant history of felony convictions involving the use or threat of violence, 42 Pa. Cons. Stat. § 9711(d)(9). It also found that Williams was not entitled to any of the statutory mitigating

circumstances set forth in 42 Pa. Cons. Stat. § 9711(e), including the provision that accounts for a defendant's age at the time of the offense, § 9711(e)(4). The jury then weighed the aggravating factors and returned a sentence of death.

At the PCRA hearing approximately twelve years later, a very different picture of Williams emerged. No fewer than eight witnesses came forward to describe a childhood plagued by frequent physical and sexual abuse. Kemp testified (in direct contradiction to her penalty phase testimony) that she "would beat Terry very often because he was smart mouthed." When Williams was in the sixth grade, Kemp met her son at school, publicly "beat him like Muhammad Ali," and then threw him down a flight of stairs. One of Williams' teachers, James Villareal, confirmed that Kemp frequently beat her son, often in public when she would retrieve him from school. Villareal said that Kemp would hit her son "in a fierce way" and typically for no apparent reason.

Kemp was not the only source of Williams' physical abuse. His brother Thomas, some ten years Williams' senior, testified that he physically "disciplined" his younger sibling. He once threw Williams down a flight of stairs and, on a separate occasion, attempted to shoot him with a rifle. Williams' older sister, Theresa, was also beaten on a routine basis by her mother. Kemp enlisted Williams' assistance in this endeavor; on more than one occasion, Williams was told to hold his sister while Kemp beat her with an electrical cord.

Williams was approximately ten years old when Kemp

married Ernest Young. Several witnesses described Young as a "drunk" who became physically violent in the throes of intoxication. Kemp said that her husband was "very cruel, very nasty," and that he often "tr[ied] to fight my children." Young typically directed his anger toward his wife; when she was not around, however, he fought with Williams. In order to escape this environment, it was not uncommon for Williams to flee the home and stay with neighbors, sometimes for days on end.

There was also sexual abuse. When Williams was very young, perhaps around the age of six, he was sodomized by a neighbor boy five years his senior. In his early teens, he was repeatedly molested by a teacher. At thirteen, Williams met and began a relationship with Norwood. Norwood was cruel and physically abusive at times; he once allegedly beat Williams with a belt. When Williams was approximately fifteen, he was attacked by an older male while staying in a boys' home. The assailant held a weapon to Williams' neck and forced him to perform fellatio.[26]

Three mental health experts testified on Williams' behalf. First, Dr. Julie Kessel, a forensic psychiatrist,

---

[26] The Commonwealth assails these allegations of sexual abuse by pointing out that not one of the purported incidents was contemporaneously reported to medical or law enforcement officials. In fact, all of the sexual abuse testimony is based upon statements provided in anticipation of the PCRA hearing. As such, the Commonwealth's point is well taken and we factor it into our prejudice analysis accordingly.

explained that she conducted a mental health evaluation during a four-hour interview with Williams in 1998. She diagnosed Williams with an array of chronic impairments: major depression with periods of recurrent psychosis and paranoia; post-traumatic stress disorder; polysubstance abuse; and borderline personality disorder. According to Dr. Kessel, each of these conditions was present in 1984. She therefore opined that Williams was suffering from extreme mental or emotional disturbance when he killed Norwood, and that he was substantially impaired in his capacity to appreciate the criminality of his conduct and to conform his actions to the requirements of the law.

The second mental health expert presented by the defense was Dr. Patricia Fleming, a clinical psychologist who interviewed Williams in 1996 for a period of seven hours and administered a battery of psychological tests. Dr. Fleming explained that Williams was "mentally ill"—among other afflictions, he suffered from post-traumatic stress disorder and was extremely passive-aggressive. Williams' personality was marked by its impulsivity; Dr. Fleming repeatedly described him as "rageful" and testified that Williams "tended to keep his anger repressed until it exploded." In the year before he murdered Norwood, Williams' "behavior was out of control" and getting worse. This rage was accompanied by a "high level of paranoia," depressive symptoms, suicidal ideation, and sleep disorder. In sum, Dr. Fleming was of the opinion that Williams killed Norwood under the influence of extreme mental or emotional disturbance, and that at the time of the offense, he was unable to appreciate the criminality of his conduct or conform his conduct to the requirements of the

75

law.

The final mental health expert for the defense was Dr. Ralph Kaufman, a clinical psychiatrist. Dr. Kaufman interviewed Williams on three separate occasions in 1996 for approximately ten hours in total. Dr. Kaufman echoed the findings of Drs. Kessel and Fleming: he stated that Williams exhibited symptoms of depression, suicidal ideation, anxiety, hypervigilance, identity difficulties, and psychotic decompensation. Furthermore, Williams suffered from post-traumatic stress disorder and was prone to impulsivity. As a result of these afflictions, Dr. Kaufman opined that Williams was under the influence of extreme mental or emotional disturbance when he killed Norwood. Dr. Kaufman could not say, however, whether Williams was unable to conform his conduct to the requirements of the law.

These three defense experts were generally consistent in tracing the origins of Williams' mental impairment. All identified recurrent childhood abuse—especially sexual abuse—as a principal cause of Williams' later psychological disorders. There was unanimous agreement that the assault at the boys' home was a "major" or "acute" trauma, one which contributed significantly to the onset of post-traumatic stress disorder. Dr. Fleming testified that it caused Williams to suffer a "psychological breakdown." He began to self-mutilate and to fantasize about suicide. He also started to experience nightmares in which he was sexually assaulted by older men wielding dangerous weapons. Williams developed an intense anger toward males who "he felt were [sexually] interested in him, whether they made advances or not." Dr.

Kessel summarized the end result of this abuse: "Every act of sexual behavior with a man would further sort of humiliate him personally and would increase his rage, which he described had been increasing. He has intense rage towards male homosexuals." Dr. Fleming called the boys' home assault "a true break." Afterwards, Williams "couldn't control himself" or contain his anger.

Not every mental health professional agreed with the opinions set forth above. In fact, Williams was subjected to several psychiatric evaluations contemporaneous with his crime spree in the mid-1980s; these evaluators uniformly concluded that Williams was mentally competent and, while perhaps somewhat maladjusted, he was not cognitively impaired. Had these evaluations been presented at the trial's penalty phase—in rebuttal to mitigation testimony offered by Williams—they surely would have bolstered the Commonwealth's depiction of a mentally competent, calculated murderer. This is not to say that the conclusions in these reports were unassailable. However, the reports dilute the strength of the mental health characterization proffered by Williams at the PCRA hearing, and they therefore constitute important anti-mitigation evidence. We must consider such evidence as part and parcel of the prejudice inquiry. *See Wong*, --- U.S. ---, 130 S. Ct. at 390.

On February 27, 1985, Williams was examined by Dr. Edwin Camiel. At the time, then-nineteen-year-old Williams had been incarcerated for eight months on charges that he murdered Norwood. Williams was "obviously anxious and his behavior was characterized by agitation and hand

77

[w]ringing." Williams told Dr. Camiel, "I can't cope with this." He reported a sensation of pressure throughout his body. Dr. Camiel recorded several clinical observations. He stated that Williams "appeared to be developing a paranoid delusional system"; that he could "detect no gross abnormalities in [Williams'] cognitive functioning"; and that Williams' "[j]udgment making capacity appeared to be somewhat impaired and his responses to social judgment questions indicated a tendency to respond impulsively to a stressful situation in a self-centered manner without regard to the consequences of his behavior for others." In Dr. Camiel's opinion, Williams' condition revealed "evidence of a developing Psychotic Disorder of a paranoid type. . . . This is the first evidence of psychiatric illness in this Defendant and the clinical picture is consistent with a diagnosis of a Schizophreniform Disorder or a briefly active psychosis secondary to the stress of his present incarceration."

Dr. Camiel's evaluation is notable because it observed the early stages of Williams' psychological difficulties and attributed their onset to circumstances subsequent to Norwood's murder. The report stated that Williams is *developing* a psychotic disorder. It portrays this turn of events as "the first evidence of psychiatric illness in this Defendant." Dr. Camiel explained that this *developing* impairment is consistent with a diagnosis of schizophreniform disorder, which by its very nature connotes a short-term ailment lasting from one to six months.[27] This time frame is

---

[27] Williams' experts acknowledged as much. Dr. Kessel stated that "schizophreniform psychosis [refers to] overt symptoms

important, for it suggests that the disorder described by Dr. Camiel did not manifest itself until *after* Williams killed Norwood. Furthermore, it indicates that eight months after the murder, Dr. Camiel detected no permanent abnormalities in Williams' cognitive function. According to Dr. Camiel, Williams' newfound psychological complications were secondary to "the stress of his present incarceration."[28] Dr. Camiel therefore recommended immediate psychiatric treatment "in order to prevent the progression of symptoms to the development of a full blown psychotic disorder."

In spite of the apparent discord between the Camiel report and the mental health narrative offered by the defense, Drs. Kessel and Fleming testified that Dr. Camiel's findings were consistent with the opinion that Williams was severely mentally impaired when he committed the crime.[29] Dr.

---

lasting under six months. . . . If it is longer than six months, we tend to call it schizophrenia." Dr. Fleming agreed, explaining that to be diagnosed with schizophreniform disorder, "the symptoms have to have lasted from one month to six months."

[28] Dr. Camiel examined Williams two days after he was convicted of third degree murder for the Hamilton killing. It was also Williams' nineteenth birthday.

[29] Drs. Kessel, Fleming, and Kaufman each criticized aspects of Dr. Camiel's report as well. Dr. Fleming stated that Dr. Camiel "didn't have the luxury . . . of having a lot of background information." Dr. Kessel testified that Dr. Camiel's report was "not particularly in depth." None of the defense doctors agreed that Williams' psychological difficulties were caused by stress

Kessel explained, "The kind of paranoia he's demonstrating [in the Camiel Report] and the anxiety level and his agitation would certainly be consistent with a post-traumatic stress disorder [patient] who has also got an underlying tendency to become psychotic." In Dr. Kessel's view the appearance of the symptoms was simply the latest complication for a long-suffering victim of psychological disorder.

But Dr. Camiel was not the only professional to find Williams mentally competent around the time of the offense. On January 14, 1983, Dr. Anthony Zanni examined Williams in anticipation of his certification hearing for the Dorfman robbery. Williams was sixteen years of age. Dr. Zanni stated that Williams' "contact with reality was good"; he "has never had persecutory delusions"; and he "has never had visual or auditory hallucinations." In addition, Williams' "[i]nsight and judgment are not impaired." Dr. Zanni diagnosed Williams with conduct disorder and concluded that he was certifiable to stand trial as an adult.

Williams was examined again on March 14, 1984 by Dr. Melvin S. Heller. He was eighteen. According to Dr. Heller, Williams "show[ed] no evidence of mental impairment" and was "[w]ithout psychosis." Williams exhibited "no signs of psychotic thought disorder, delusions, hallucinations, inappropriate affect, inadequate attention span or bizarre behavior." Moreover, there was "no indication that

_____

related to incarceration. According to Dr. Fleming, the symptoms were too serious to be caused by incarcerative stress.

80

[Williams was] operating under any undue mental or emotional stress," and Dr. Heller indicated that Williams' "prospects for community adjustment would appear to be most favorable." Three months after Dr. Heller's evaluation, Williams murdered Norwood. He had killed Hamilton just two months prior. Thus, the Heller report captured Williams in the midst of his crime spree. Its contents are difficult to reconcile with the testimony of Drs. Kessel, Fleming, and Kaufman.

One additional category of anti-mitigation evidence bears consideration: during Williams' certification proceeding in January 1984, approximately ten to fifteen witnesses—Williams' family and friends—provided testimony portraying Williams' home life as stable, loving, and supportive. Williams was, for example, engaged in "honest" pursuits; he was a football star with pending scholarship offers; he was a "bright young man" with a "wonderful future." Marlene Rogers and Lucille Rogers (mother of Marlene and grandmother of Williams' child), echoed this theme in 1984. Both returned for the PCRA hearing in 1998 and changed their tune, characterizing Williams' home life as a "terrible situation" permeated by "abusive behavior."

There was additional evidence, contemporaneously provided, suggesting that Williams' home life was not as nightmarish as that which he depicted on collateral review. Williams' mother repeatedly told probation officers that her relationship with her son was "satisfactory." At trial, she flatly denied inflicting any abuse. She certainly never mentioned a single instance of sexual abuse. What is more,

81

Williams himself echoed these sentiments, telling at least one probation officer that "he had a happy childhood," and was "inspired" by his family, neighbors, and coaches. Williams never provided contrary testimony under oath.

To acknowledge testimony portraying Williams' upbringing in a positive light is not to reject the PCRA narrative of lifelong physical and sexual abuse. However, the parade of witnesses who testified at the certification proceeding described Williams' home life very differently than those who appeared at the PCRA hearing. Similarly, the testimony provided by Williams' mother could scarcely have been more contradictory. For purposes of our prejudice inquiry, it is the fact of inconsistency that is important. If nothing else, the Commonwealth could have used the certification testimony to considerable advantage by impeaching the PCRA narrative. The opportunities for attacking the credibility of those who depicted Williams' life of near-constant abuse would have been legion, thereby diluting the effectiveness of the proffered mitigation evidence. Our consideration of the reconstituted record simply cannot ignore such pointed anti-mitigation evidence.

## 2    Assessing the Evidence

In order to show prejudice, Williams must establish that there is a reasonable probability that but for Panarella's deficient performance, "one juror would have voted for life imprisonment rather than the death penalty." *Bond*, 539 F.3d at 289. Even if he successfully makes such a showing, however, Williams must then demonstrate that the

82

Pennsylvania Supreme Court's contrary holding was unreasonable. *See Harrington*, --- U.S. ---, 131 S. Ct. at 786 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"). Overcoming this hurdle is no simple undertaking; as the Supreme Court has recently stressed, the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (quoting *Knowles v. Mirzayance*, --- U.S. ---, 129 S. Ct. 1411, 1420 (2009)).

In reviewing Williams' mitigation evidence, the Pennsylvania Supreme Court held that Panarella's failure to present this information at the penalty phase did not prejudice Williams' defense.[30] On federal habeas review, the District

---

[30] Williams argues that the Pennsylvania Supreme Court unreasonably applied *Strickland* because it "articulated an incorrect prejudice standard." He is wrong. The Court's opinion twice sets forth its prejudice standard: in the first instance, the Court states that a petitioner cannot prevail on an ineffective assistance claim "where there is no showing that [mitigating] testimony . . . would have been beneficial in terms of altering the outcome of the penalty phase hearing," *Commonwealth v. Williams* (*Williams II*), 863 A.2d 505, 519 (Pa. 2004) (internal quotation omitted); in the second instance, the Court concluded that "appellant has not met his burden of demonstrating there was [a] reasonable probability the presentation of this evidence would have resulted in a life sentence instead of the death penalty," *id.* at 521 n.12. Both articulations are reasonable under *Strickland*; the latter parrots language of the decision itself. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). Nonetheless, Williams fixates upon the Pennsylvania Supreme Court's lone reference to a

83

Court concluded that the Pennsylvania Supreme Court's decision was not an unreasonable application of *Strickland*. We agree.

The mitigation evidence elicited by Williams on collateral review is no doubt sympathetic. It portrays a much more complicated and troubled individual than the one depicted during the trial's penalty phase. But the evidence is not unequivocally mitigating. Some of the evidence is even contradictory. Had Williams offered Drs. Kessel, Fleming,

petitioner's "heavy" burden when attempting to establish prejudice. *See Williams II*, 863 A.2d at 519 ("Appellant has not met this heavy burden."). Williams argues that by using such a descriptor, the Court actually imposed a burden much more stringent than the "reasonable probability" requirement set forth in *Strickland*. We cannot agree. Although the Pennsylvania Supreme Court's choice of words was imprecise, there is no indication that the Court in fact held Williams to an incorrect prejudice standard. It twice articulated a standard consistent with *Strickland*, and it is clear from the Court's opinion that it did not consider the mitigation evidence to be the least bit persuasive. We find that by describing Williams' burden as "heavy," the Pennsylvania Supreme Court was merely recognizing the difficulty of prevailing on an ineffective assistance of counsel claim. To accept the contrary argument is to disobey "§ 2254(d)'s highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotation marks omitted). Such "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law," *id.*, and we accordingly reject it.

and Kaufman at the penalty phase, the Commonwealth could have countered with an abundance of evidence suggesting that Williams was not mentally ill and that he did not suffer psychological impairment. After all, Williams was examined by at least three professionals in and around the time of Norwood's murder; not one thought him seriously mentally impaired. Dr. Zanni stated that Williams' "[i]nsight and judgment are not impaired"; Dr. Heller reported that Williams "show[ed] no evidence of mental impairment" and was "[w]ithout psychosis." According to Dr. Camiel, Williams' symptoms of psychosis were recent and they appeared after Norwood was murdered and Williams was incarcerated. Not one of these doctors thought Williams was suffering from psychosis on or around the time of the offense; indeed, the record is devoid of contemporaneous evidence of psychological impairment. This final point is critical, for it distinguishes the instant matter from decisions such *Thomas v. Horn*, 570 F.3d 105 (3d Cir. 2009), where evidence that the petitioner was mentally ill at the time of the offense was clear and undisputed. *See id.* at 126 (stating that "the Commonwealth does not dispute that even the most cursory search would have yielded evidence of Thomas' long history of mental illness").

The conflicting nature of the mental health testimony is, in fact, reminiscent of our recent decision in *Lewis v. Horn*, 581 F.3d 92 (3d Cir. 2009). There, we found that evidence purporting to show that petitioner was mentally ill and brain damaged was "in large part contradictory." *Id.* at 112. Evaluations conducted contemporaneous to petitioner's crime revealed a mentally competent young man, while those

85

performed in anticipation of the PCRA proceeding portrayed an individual riddled with psychological difficulty. *Id.* at 112–13. The contradictory nature of the evidence undercut the effectiveness of Lewis' mitigation testimony, and precluded us from overturning the state courts' determination that Lewis was mentally competent at the time of the offense. Williams' mental health evidence is similarly undercut in the instant matter.

Furthermore, even the testimony offered by Williams' mental health experts was not uniformly sympathetic. Drs. Kessel and Fleming spoke of Williams' inner "rage," especially with respect to "males who behaved sexually toward him." Dr. Fleming explained that Williams suppressed this rage "until it exploded." She described him as extremely impulsive, and opined that Williams gave "less consideration to the consequences of his actions than a normal person would." Dr. Kaufman echoed this sentiment, testifying that Williams redirected his inner pain onto others "without regard to the consequences." Such evidence is not necessarily mitigating, even if all three doctors rationalized this conduct by linking it to Williams' post-traumatic stress disorder. Their explanation was obviously insufficient for the Pennsylvania Supreme Court, which found that the mitigating evidence offered by Drs. Kessel, Fleming, and Kaufman was neutralized by Williams' predilection to "direct[] his hurt onto other people and . . . to respond to stressful situations in a manner without regard to the consequences." *Williams II*, 863 A.2d at 520 (quoting PCRA decision and adopting its findings). The Court therefore rejected the collective opinion that Williams was acting under extreme mental disturbance at

the time of the offense and that his capacity to appreciate the criminality of his conduct or to conform it to the requirements of the law was substantially impaired. Given the conflicting evidence of psychological damage, we cannot say that this finding was an unreasonable determination of facts under § 2254(d)(2).

The testimony concerning Williams' home life is also in tension with itself. On the one hand, several witnesses appeared at the PCRA hearing to describe years of physical beatings and sexual molestation. Their narrative was one of serious, long-term abuse. On the other hand, ten to fifteen witnesses took the stand at Williams' certification proceeding and provided a much different characterization. According to this account, provided six months prior to the Norwood murder, Williams' family and friends were loving, supportive, stable, and certainly not abusive. Some of this anti-mitigation evidence was offered by the very witnesses who later described Williams' home life in a negative light. Williams himself described his upbringing in positive terms. He told Dr. Heller (three months before he murdered Norwood) that "his family relationships are close and meaningful." He never acknowledged any physical or sexual abuse in or around the time of the murder. Williams' only statements to the contrary were elicited ten years after his conviction, in preparation for PCRA review. The contradictory nature of the abuse testimony seriously dilutes its mitigating effect.[31] *See Lewis*, 581 F.3d at 112–13

---

[31] Williams suggests that we should overlook the contradictory nature of the abuse testimony. In support of this assertion, he cites

87

(remarking that petitioner never acknowledged physical abuse and suggesting that his failure to do so was anti-mitigation evidence).

In addition to the evidence set forth above, we cannot lose sight of the aggravating factors present in this case, which were significant and afforded considerable weight by the state court. The Pennsylvania Supreme Court highlighted the manner in which Williams "planned and carried out the killing, as well as his subsequent attempts to cover up the murder by burning the body." *Williams II*, 863 A.2d at 520. On top of this, Williams "had a significant history of violent felony convictions," *id.* at 521 n.12; "this was not his first

---

to our recent decision in *Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008). His citation is inapposite. In *Bond*, the petitioner offered evidence during the PCRA proceeding that depicted "an extremely troubled and deprived childhood." *Id.* at 280. Such evidence differed significantly from that offered at the petitioner's trial, where there was general testimony of childhood difficulty but not of anywhere near the magnitude described during postconviction proceedings. *See id.* at 279–81. We found that the mitigation evidence offered during collateral review was highly persuasive and its omission from trial was prejudicial. In *Bond*, however, we explained that the evidence of childhood abuse and neglect "would not contradict earlier testimony, but rather provide details not uncovered by trial counsel at the penalty phase hearing." *Id.* at 291. This is not the case in the present matter; the testimony of Williams' childhood abuse contradicts that set forth at the certification hearing and provided by his mother at the trial's penalty phase. As such, the mitigating effect of the evidence is seriously undercut.

murder," *id.*  For the Pennsylvania Supreme Court, the brutal facts of the murder, combined with Williams' criminal history, strongly counseled against a finding of prejudice.

In *Woodford v. Visciotti*, 537 U.S. 19 (2002), the United States Supreme Court considered a petition that was in some respects similar to that presented in the instant matter. Visciotti shot and murdered one victim and seriously maimed a second before he was arrested and later convicted of first degree murder.  On collateral review in the state courts, Visciotti argued that he received ineffective assistance of counsel during the trial's penalty phase because his attorney failed to present evidence that Visciotti grew up in a "dysfunctional family in which he suffered continual psychological abuse." *Id.* at 26 (internal quotations omitted). This troubled past, in turn, purportedly led to myriad psychological difficulties in Visciotti's adult life. *Id.*  The state supreme court rejected Visciotti's petition, concluding that

> the circumstances of the crime (a cold-blooded execution-style killing of one victim and attempted execution-style killing of another, both during the course of a preplanned armed robbery) coupled with the aggravating evidence of prior offenses (the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby) was devastating.

*Id.* (describing state supreme court decision).  These

89

aggravating factors were so severe, the state supreme court concluded, that they completely overwhelmed the evidence proffered in mitigation. Therefore, trial counsel's failure to present the mitigating evidence in the first instance was not prejudicial. *Id.* On federal habeas review, the Ninth Circuit granted the writ, but the Supreme Court reversed. According to the Supreme Court, AEDPA endows the state courts with primary responsibility for weighing aggravating and mitigating factors in a prejudice inquiry. *Id.* at 27. Furthermore, it was not objectively unreasonable for the state supreme court to attribute significant weight to the aggravating circumstances in a situation such as this—the crime was particularly heinous and, more importantly, Visciotti had a pronounced history of violent felony convictions. By downplaying the weight of the aggravating factors, the Ninth Circuit had inappropriately substituted its own judgment for that of the state supreme court. *Id.* at 26–27. *Woodford* makes clear that such second-guessing is unwarranted on federal habeas review.

*Woodford*'s reasoning is particularly apt here. The Pennsylvania Supreme Court found that Williams' brutal crimes and record of violent convictions overwhelmed the evidence proffered in mitigation. The Court took especial note that "this was not [Williams'] first murder conviction," *Williams II*, 863 A.2d at 521 n.12, and it specifically adopted the reasoning of the PCRA court, which found that the aggravating evidence "outweighed" the mitigating testimony offered by Williams' mental health experts, *see id.* at 520. In other words, the state supreme court concluded that given the nature of the aggravating circumstances, Williams could not

90

meet "his burden of demonstrating there was a reasonable probability [that] the presentation of [mitigating] evidence would have resulted in a life sentence instead of the death penalty." *Id.* at 521 n.12. In light of the totality of the reconstituted record—the nature of the offense and Williams' history as a convicted murderer, as well as the equivocal nature of the mitigation evidence—we cannot say that this determination was unreasonable.

The Pennsylvania Supreme Court's decision is further bolstered by the fact that the jury did not find Williams' youth to be a circumstance that mitigated the severity of the offense. If ever a capital defendant qualified for the mitigating circumstance set forth in 42 Pa. Cons. Stat. § 9711(e)(4), Terrance Williams did. He was four months past his eighteenth birthday. According to Williams' brief, he is one of the youngest men ever placed on Pennsylvania's death row. Williams' trial counsel built his closing argument around his client's youth and begged the jury to find that age was a mitigating factor. But to no avail. The jury's rejection of this mitigation argument is telling; it strongly suggests that the jurors' collective evaluation of Williams' character would have led them to reject other, less clear-cut mitigating evidence. *See, e.g.*, *Wiggins*, 539 U.S. at 535 (indicating that characteristics which reflect the defendant's "moral culpability" are relevant at the penalty phase); *see also Jermyn*, 266 F.3d at 310 (explaining that at the penalty phase, jury appraises defendant's "moral culpability"). This is but another factor that points away from a finding of prejudice.

In sum, the Pennsylvania Supreme Court found that

91

Williams was not prejudiced by Panarella's failure to present the mitigating evidence set forth in postconviction proceedings. This determination was not an unreasonable application of *Strickland*. In reaching our conclusion, we are mindful of the Supreme Court's recent admonition that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, --- U.S. ---, 131 S. Ct. at 786. That "'fairminded jurists could disagree' on the correctness of the state court's decision," is, by itself, a sufficient basis for rejecting federal habeas relief. *Id.* (quoting *Yarborough*, 541 U.S. at 664). The reconstituted record consists of conflicting mental health evaluations, contradictory depictions of Williams' home life, and unequivocal evidence regarding the brutality of the crime and Williams' history of violent offense conduct. *Strickland* was not unreasonably applied on this record. Habeas relief is therefore unwarranted.

## IV

In 1986, a Pennsylvania jury convicted Terrance Williams of first degree murder and recommended a sentence of death. Williams' conviction was upheld by the state courts on direct appeal, and his attempts to obtain collateral relief were likewise unavailing. On federal habeas review, the District Court denied Williams' petition for relief. Today we affirm that judgment for the reasons set forth above. In so doing, we are mindful of the gravity of our decision. We are bound, however, to respect the lawful decisions of the state courts. Thus, twenty-five years after the jury returned its verdict, we deny Williams' request for habeas relief.